CAMPBELL & WILLIAMS
DONALD J. CAMPBELL, ESQ. (1216)
djc@campbellandwilliams.com
J. COLBY WILLIAMS, ESQ. (5549)
jcw@campbellandwilliams.com
700 South Seventh Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

LAVELY & SINGER
PROFESSIONAL CORPORATION
MARTIN D. SINGER (SBN 78166)  *(pro hac vice)*
mdsinger@lavelysinger.com
TODD S. EAGAN (SBN 207426)  *(pro hac vice)*
teagan@lavelysinger.com
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone: (310) 556-3501
Facsimile: (310) 556-3615

Attorneys for Defendants Pulse Evolution Corporation,
Pulse Entertainment Corporation and John Textor

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| HOLOGRAM USA, INC., a Delaware corporation; MUSION DAS HOLOGRAM LIMITED, a corporation organized under the laws of the United Kingdom; and UWE MAASS, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>PULSE EVOLUTION CORPORATION, a Nevada corporation; PULSE ENTERTAINMENT CORPORATION, a Delaware corporation; JOHN C. TEXTOR, an individual; DICK CLARK PRODUCTIONS, INC., a Delaware corporation; JOHN BRANCA and JOHN MCCLAIN, Executors of the Estate of Michael J. Jackson; MJJ PRODUCTIONS, INC., a California corporation; MUSION EVENTS LTD., a United Kingdom private company; MUSION 3D LTD., a United Kingdom private company; WILLIAM JAMES | Case No.: 2:14-cv-00772-GMN-NJK<br><br>SUPPLEMENTAL DECLARATION OF MARK DEEM IN SUPPORT OF DEFENDANTS PULSE ENTERTAINMENT CORPORATION, PULSE EVOLUTION CORPORATION AND JOHN TEXTOR'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) AND 12(b)(3) OR, ALTERNATIVELY: (1) MOTION FOR MORE DEFINITE STATEMENT PURSUANT TO FRCP 12(e) AND (2) MOTION TO STAY THE ACTION PENDING RESOLUTION OF PENDING ARBITRATION |

SUPPL. DECL. OF MARK DEEM

| | |
|---|---|
| 1 | ROCK, an individual; IAN CHRISTOPHER O'CONNELL, an individual; and DOES 1 through 10, ) ) ) |
| 2 | ) |
| 3 | Defendants. ) ) |

SUPPL. DECL. OF MARK DEEM

# SUPPLEMENTAL DECLARATION OF MARK DEEM

I, Mark Deem, declare and state as follows:

1. I am a Partner in the law firm Edwards Wildman Palmer LLP, resident in the London office and, since April 2013, have represented the interests of Defendant William James Rock, including, without limitation, in an arbitration pending before the London Court of International Arbitration ("LCIA") involving Messrs. Rock, O'Connell, Maass and Musion Events Limited ("MEL"), which company is owned by Rock and O'Connell, each of whom are parties to the instant action. I have personal knowledge of the facts stated herein and if called and sworn as a witness would testify competently thereto.

2. This is my second declaration in these proceedings in support of Defendants' Motion to Dismiss Pursuant To FRCP 12(b)(6) and 12(b)(3) or, Alternatively: (1) Motion for More Definite Statement Pursuant to FRCP 12(e) and, (2) Motion to Stay the Action Pending Resolution of Arbitration.

3. Since executing my first declaration on June 24, 2014, I have been provided with a copy of Plaintiffs' Opposition to the Motion and the evidence in support thereof, specifically the declarations of Messrs. Giovanni Palma, Andrew Cromby, Simon Miles and Alkivlades David.

4. Having reviewed these documents, I am aware that Plaintiffs have raised the following arguments in support of their Opposition to the Motion :

    a. Musion Das Hologram ("MDH") possesses the licensing rights and was validly assigned the '212 Patent pursuant to an Asset Sale Agreement, by which it purchased the assets of Musion Systems Limited ("MSL") on or around September 26, 2013 (Opposition at 4:6);

    b. Hologram USA acquired the exclusive rights to use both the '519 patent (from Uwe Maass) and the '212 patent (from MDH) in February 2014 (Opposition at 2:22); and

///

///

1

SUPPL. DECL. OF MARK DEEM

  c. The arbitration proceedings before LCIA, which involves several of the parties to the instant action, is *"entirely unrelated to issues in this patent infringement action"* and *"concerns certain patent rights applicable in foreign territories, not the United States"* (Opposition at 7:18 and 4:8).

5. In fact, each of these three arguments is inaccurate and materially misrepresents the key facts. The true facts may be summarized as follows, and are developed further, below:

  a. MDH did not acquire the '212 patent from MSL pursuant to the Asset Sale Agreement on September 26, 2013 because it was not an asset of MSL at that time – in fact there is a prior assignment of the '212 Patent from MSL to Musion IP Limited ("MIP") dated May 29, 2013 recorded with the United States Patent & Trademark Office ("USPTO"). Attached hereto as Exhibits "A" and "B" are true and correct copies of the USPTO record of assignment of the '212 patent from MSL to MIP as of May 29, 2013, as well as the assignment itself dated May 29, 2013, respectively.

  b. Maass was contractually barred from assigning any interest in the '519 patent to a third party without the prior approval of Messrs. Rock and O'Connell (which approval was never given). More specifically, under Paragraph 2.3 of the agreement dated June 25, 2007 entitled Heads of Agreement, Reorganisation of the Eyeliner Business (the "Eyeliner Agreement"), as of February 2014, Maass could not grant an exclusive right with respect to the '519 patent to any third party without Rock and O'Connell's approval – including to Hologram USA. A true and correct copy of the Eyeliner Agreement is attached to my original Declaration in this action as Exhibit "A," and attached hereto as Exhibit "C" for the convenience of the Court.

  c. The LCIA arbitration addresses issues related to the parties' dispute in the instant action, including patent rights within the territory of the United States. More specifically, Paragraph 2.4(d)(i) of the Eyeliner Agreement – which is at the

heart of the LCIA arbitration – comprises a grant of a perpetual irrevocable exclusive sub-licensable license to do two things: first, exploit all intellectual property rights in respect of the Foil and the Licensed Product (which includes the '519 and '212 patents) in the defined MEL Territories; and, secondly, to **carry out installations of Foil and/or Licensed Product (which includes the '519 and '212 patents) in <u>any place in the world</u>**, albeit for persons or companies domiciled in the MEL Territories. Licensed Product is defined as *"a system for creating floating virtual 3D video images incorporating the Foil using some or all of the Maass Registrations* [which includes the '519 Patent] *and the MSL Registrations* [which includes the '212 Patent] *and installation technology."* Thus, <u>**the issue of whether the '519 and '212 patents are subject to an agreement among O'Connell, Rock, Musion Events Limited ("MEL") and Maass permitting certain use of those patents in various territories, including the United States, is currently in dispute in the LCIA arbitration**</u>.

### *<u>MDH Did Not Acquire the '212 Patent When it Purchased the Assets of MSL</u>*

6.  It is asserted by Plaintiffs that MDH was assigned the '212 Patent and other intellectual property rights by the Administrators of MSL in September 2013. In support, Plaintiffs purport to provide a full narrative of the bidding war for the assets of MSL which took place in or around September 2013 (Opposition at 4:12), including certain legal proceedings which ensued in the English High Court and which were ultimately taken, on appeal, to the English Court of Appeal. Plaintiffs submitted a copy of the Judgments of the English High Court English and the English Court of Appeal in support of their Opposition (see the Declaration of Simon Miles, Exs. "A" and "B" thereto, respectively (Document No. 70)).

///
///
///

7.     Whilst Plaintiffs correctly note that, on appeal, the English Court of Appeal *"found that the lower court had acted within its discretion"* (Opposition at 6:12) and that the *"Administrators did achieve a proper price for the business and assets of MSL"* (Opposition at 6:13), it is wholly improper and grossly misleading for Plaintiffs to assert that, *"MDH is the owner of MSL's assets, including the '212 Patent"* or that, *"the Court of Appeal in the United Kingdom recently rejected O'Connell's challenge to the administrator's sale of MSL's assets to MDH, and therefore MDH possesses the licensing rights associated with the '212 patent, as well as any other rights sold to it"*. (Opposition at 12:1). Such assertions are completely unsupported by the Judgments of both the English High Court and Court of Appeal (the "Judgments"), nor do Plaintiffs point to such an express finding in the Judgments, because there is none.

8.     Equally, it is entirely misleading for Plaintiffs to assert that the *"Court of Appeal recently confirmed that MDH is the proper owner of the '212 Patent"* (Opposition at 10:11). This is simply not the case – at no point did the English High Court or English Court of Appeal ever make any finding as to who owned the '212 Patent, whether as alleged or at all. Plaintiffs cannot cite such an express finding in the Judgments, because there is none.

9.     Moreover, at all relevant times during the sale process of the assets of MSL, it was made clear to all potential purchasers (which included my client, Mr. Rock, in August and early September) by the Administrators that MSL would only be selling such right, title and interest (if any) as it had in relation to a number of assets. In that regard, the sale was akin to a quit-claim sale with no representations or assurances made as to the assets of MSL. Indeed, the Asset Sale Agreement signed by Mr. Palma on behalf of MDH records precisely this fact at paragraph 2.1.1:

> *The Seller shall sell, assign and transfer to the Buyer and the Buyer shall purchase as at Completion such right, title and interest (if any) as the Seller may have in .... (b) the Business Intellectual Property Rights.*

A true and correct copy of the Asset Sale Agreement is attached hereto as Exhibit "D"

10. This is further emphasized in paragraph 7 (Intellectual Property) of the Asset Sale Agreement, which provides:

> *The assignment of the Goodwill and Business Intellectual Property Rights pursuant to Clause 2.1 is of all such rights, title and interest (if any) in and to the Goodwill and Business Intellectual Property Rights as the Seller may have an is legally able to assign.* <u>*The Buyer acknowledges that the Business Intellectual Property Rights may be subject to restrictions or deficiencies that have not been disclosed to the Seller of the Administrators and that they or any of them may not be capable of being legally transferred to the Buyer.*</u> *The Buyer undertakes to make its own enquiries into all such matters.*

11. Likewise, the Asset Sale Agreement contained no warranties, representations, conditions or guarantees as to rights, title and interests in any property (including the '212 Patent) were given. See Ex. "D" Asset Sale Agreement, Clause 22.

12. As is clear from an up-to-date Patent Query on the USPTO website, and as referenced above, there is a recorded assignment of the '212 Patent from MSL to MIP dated May 29, 2013, prior to the sale of MSL to MDH. (It is noted that the Exhibit to Mr. Palma's declaration, which purports to be a search of the USPTO website, is out of date in relation to this.)

13. This assignment to MIP pre-dated the administration process such that, as of the date of the Asset Sale Agreement, MSL had no legal right to the '212 Patent and title to this patent could not pass to MDH. Any purported assignment by MSL or its administrators of the '212 Patent to MDH was not capable of being executed.

14. In the Judgments, the English High Court and Court of Appeal only upheld the transfer of a class of assets (*i.e.*, those assets actually held by MSL and which were legally capable of being transferred) from MSL to MDH.

15. It is a *non-sequitur* to assert, as Plaintiffs do, that MDH therefore *"possesses the licensing rights associated with the '212 Patent"* (Opposition: page 12, line 3). To do so is to misunderstand the sales process of September 2013 as evidenced by the executed Asset Sale Agreement and the terms of the judgment of the English Court of Appeal.

### *Hologram USA Did Not Acquire Exclusive Rights to the '212 Patent and the '519 Patent*

16.  Quite simply, in circumstances where MSL did not own the '212 Patent in September 2013 (as a result of the May 29, 2013 assignment to MIP described above and evidenced on the USPTO website), MDH could not acquire the '212 patent under the terms of the Asset Sale Agreement it executed in September 2013. It follows, therefore, that it had no right to assign or otherwise license the '212 Patent to Hologram USA in February 2014 or at all.

17.  Likewise, in relation to the '519 Patent, whilst it is accepted that this patent is, was and has always been owned by Mr. Maass, he did not have an unfettered right to deal with that patent as he saw fit and without having first obtained the consent of Mr. Rock and Mr. O'Connell under paragraph 2.3 of the Eyeliner Agreement, such that he could grant an exclusive right to Hologram USA in respect of the '519 Patent in February 2014.

18.  In light of the above, it does not follow that Hologram USA has the exclusive right to both the '212 Patent and the '519 Patent. Depending upon on how the LCIA Arbitration develops, it may well have neither. In these circumstances, neither Hologram USA nor MDH would have standing in these proceedings.

### *The LCIA Arbitration is Adjudicating Issues Related to the Exploitation of the '519 and '212 Patents in the USA and Canada*

19.  The Opposition to the Motion provides a particularly misleading impression both of the terms of the Eyeliner Agreement and the matters in arbitration in London.

20.  Pursuant to the terms of the Eyeliner Agreement, the right of MEL to use the '519 and '212 patents is expressed to be exclusive, perpetual and irrevocable. An arbitral award confirming these exclusive rights will necessarily impact the quality, territorial extent and status of the rights (if any) enjoyed by MDH to the '519 and '212 patents.

SUPPL. DECL. OF MARK DEEM

21. At various stages in the Opposition and the supporting evidence, the issue is put as follows: *"the LCIA arbitration has nothing whatsoever to do with the Plaintiffs' claims of patent infringement and will not determine any issue in this action."* (Opposition at 1:20); and it is described as an *"irrelevant arbitration"* (Opposition at 2:6). The stated reason for this is because the LCIA arbitration is considered to relate to *"certain patent rights applicable in foreign territories, **not the United States**"* (emphasis added by the Plaintiffs) (Opposition at 4:6).

22. Mr. Cromby goes further: *"There was no license granted to Mr. O'Connell, Mr. Rock and MEL for the use of the '519 Patent and '212 Patent in the United States and Canada"* (Cromby Declaration, ¶ 8a).

23. The precise language of paragraph 2.4(d)(i) of the Eyeliner Agreement shows Plaintiffs' position in relation to this matter to be overly simplistic and capable of misleading this Court.

24. In particular, and as referenced, above, paragraph 2.4(d)(i) – which is at the heart of the LCIA arbitration – comprises a grant of a perpetual irrevocable exclusive sub-licensable license to do two things: first, exploit all intellectual property rights in respect of the Foil and the Licensed Product in the defined MEL Territories; and, secondly, to carry out installations of Foil and/or Licensed Product in **any place in the world**, albeit for persons or companies domiciled in the MEL Territories (which territories include, without limitation, the U.K.). See Ex. "C," Eyeliner Agreement, ¶¶ 2.2(b)(iii) and 2.4(d)(i). Plaintiffs do not dispute this Paragraph is at issue in the LCIA arbitration, as reflected in the Cromby Declaration, at Paragraph 7(a).

25. Based upon my understanding of the allegations of the First Amended Complaint, it is alleged that Musion3D Limited, Messrs. Rock and O'Connell (each of whom is alleged in the First Amended Complaint to be resident and domiciled in the United Kingdom) were instrumental to the installation of Foil and Licensed Product at the 2014 Billboard Awards in Las Vegas. Assuming the LCIA arbitration award confirms that the grant of a perpetual irrevocable exclusive and sub-licensable license

7

SUPPL. DECL. OF MARK DEEM

contemplated by Paragraph 2.4(d)(i) of the Eyeliner Agreement was capable of surviving a purported termination of the Eyeliner Agreement (the key issue in the LCIA arbitration), then there would be no impediment to Musion3D, Mr. Rock and/or Mr. O'Connell as MEL licensees to install Licensed Product (defined as *"a system for creating floating virtual 3D video images incorporating the Foil using some or all of the Maass Registrations* [which includes the '519 Patent] *and the MSL Registrations* [which includes the '212 Patent] *and installation technology"*) in any place in the world, including the USA and Canada. See Ex. "C" (Eyeliner Agreement), ¶2.4(d)(i).

26. Indeed, the Eyeliner Agreement reflects, and the parties have always acknowledged, that the grants of license were on a global basis, but with territorial restraints based upon location and domicile of the ultimate customer. See Ex. "C" (Eyeliner Agreement), ¶2.4(d)(i).

27. Thus, the LCIA arbitration will determine key issues regarding exclusive rights to use the '519 and '212 patents, including in the United States, among parties to the instant action, *i.e.*, Messrs. Rock and O'Connell, Musion3D Limited, MEL and Mr. Maass.

28. Likewise, and as explained in my original Declaration, Paragraph 2.3 of the Eyeliner Agreement (which bars Maass from unilaterally assigning or transferring the '519 patent without the consent of O'Connell and Rock) is in issue in the LCIA Arbitration. This is confirmed by Plaintiffs via Mr. Cromby's Declaration, Paragraph 8(d), in which he concedes that *"If the licenses granted to MSL in paragraphs 2.4(b)(ii) and (f) survive termination of the 2007 Document [the Eyeliner Agreement], they are expressly stated to be sublicenseable.* <u>*The purported restriction on Mr. Maass in*</u>

///
///
///

*paragraph 2.3 is not in issue in the LCIA Arbitration except indirectly, as a consequence of the licenses granted in paragraph 2.4."*

29. Thus, the forthcoming arbitral award will impact the ability of Mr. Maass to grant exclusive rights to the '519 Patent to Hologram USA as at no point has the permission of Messrs. Rock or O'Connell been sought (or given) under the terms of paragraph 2.3 of the Eyeliner Agreement.

30. To the extent there are additional phases of the LCIA arbitration (and there is no such order from the LCIA that there will be additional phases) any claims Mr. Maass has concerning the termination of the Eyeliner Agreement will necessarily be in issue immediately following the forthcoming award in the LCIA arbitration: if the arbitration determines that the perpetual, exclusive and irrevocable rights granted to MSL and MEL are not capable of surviving a termination of the Eyeliner Agreement (as Mr. Maass alleges), then he will doubtless seek to show the Arbitration Tribunal that there was a termination; if, however, the LCIA Arbitration determines that it is capable of surviving termination, then MEL will doubtless seek to show that Arbitration Tribunal that further clauses dealing with intellectual property rights must also survive in tandem with the rights granted to MEL. This includes paragraph 2.3.

31. The recent LCIA arbitration hearing concluded on or around July 4 and an Award is due in the next 30 days or so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of July, 2014, at 69, Old Broad Street, London U.K. EC2M 1QS

_____
MARK DEEM

9

SUPPL. DECL. OF MARK DEEM