1  CAMPBELL & WILLIAMS
   DONALD J. CAMPBELL, ESQ. (1216)
2  djc@campbellandwilliams.com
   J. COLBY WILLIAMS, ESQ. (5549)
3  jcw@campbellandwilliams.com
   700 South Seventh Street
4  Las Vegas, Nevada 89101
   Telephone: (702) 382-5222 / Facsimile: (702) 382-0540
5
   LAVELY & SINGER PROFESSIONAL CORPORATION
6  MARTIN D. SINGER (SBN 78166) *(pro hac vice)*
   mdsinger@lavelysinger.com
7  TODD S. EAGAN (SBN 207426) *(pro hac vice)*
   teagan@lavelysinger.com
8  2049 Century Park East, Suite 2400
   Los Angeles, California 90067-2906
9  Telephone: (310) 556-3501 / Facsimile: (310) 556-3615

10 Attorneys for Defendant William James Rock,

11

12                    UNITED STATES DISTRICT COURT

13                          DISTRICT OF NEVADA

14 HOLOGRAM USA, INC., a Delaware          )  Case No.: 2:14-cv-00772-GMN-NJK
   corporation; MUSION DAS HOLOGRAM        )
15 LIMITED, a corporation organized under the )  **DECLARATION OF TODD S. EAGAN IN**
   laws of the United Kingdom; and UWE     )  **SUPPORT OF DEFENDANT WILLIAM**
16 MAASS, an individual,                   )  **JAMES ROCK'S MOTION TO DISMISS**
                                           )  **ALL CLAIMS RELATING TO**
17            Plaintiffs,                  )  **INFRINGEMENT OF U.S. PATENT NO.**
        v.                                 )  **5,865,519 PURSUANT TO FRCP 12(b)(6)**
18                                         )
   PULSE EVOLUTION CORPORATION, a          )
19 Nevada corporation; PULSE               )
   ENTERTAINMENT CORPORATION, a            )
20 Delaware corporation; JOHN C. TEXTOR, an )
   individual; DICK CLARK PRODUCTIONS,     )
21 INC., a Delaware corporation; JOHN BRANCA )
   and JOHN MCCLAIN, Executors of the Estate )
22 of Michael J. Jackson; MJJ PRODUCTIONS,  )
   INC., a California corporation, MUSION  )
23 EVENTS LTD., a United Kingdom private   )
   company; MUSION 3DLTD., a United        )
24 Kingdom private company; WILLIAM JAMES  )
   ROCK, an individual; IAN CHRISTOPHER    )
25 O'CONNELL, an individual; and DOES 1    )
   through 10,                             )
26                                         )
              Defendants.                  )
27 _____ )

28

---
DECLARATION OF TODD S. EAGAN RE WILLIAM JAMES ROCK'S MTN TO DISMISS

I, Todd S. Eagan, declare as follows:

1. I am an attorney at law duly licensed to practice pro hac vice before the United States District Court of Nevada, and am a member of the law firm Lavely & Singer Professional Corporation, counsel of record for Defendant William James Rock ("Defendants") herein. I have personal and first-hand knowledge of the matters set forth in this Declaration and, if called as a witness, could and would testify competently thereto under oath.

2. Although not presented for purposes of determination in the context of the instant Motion, Plaintiff Uwe Maass has made representations that the '212 patent is invalid – in direct contradiction to Plaintiffs' claims in the instant action. For example, on September 15, 2013, Mr. Maass represented in a text message to Defendant John Textor, that he is in possession of a "drawing and statement from 1999" that invalidate the '212 patent. Attached hereto as Exhibit "A" is a true and correct copy of the September 15, 2014 text message from Mr. Maass to Mr. Textor.

3. Subsequently, on July 2, 2014, Mr. Maass testified in the proceeding entitled *Musion Events Ltd., et al. v. Uwe Maass*, LCIA Arbitration No. 132483. The transcript of that proceeding reflects that Mr. Maass testified that the '212 patent is essentially invalid: "*Look, Peppers Ghost 2 [i.e., the '212 patent] is made to enhance the lifespan of patent protection. That was the initial thought of it. But it is actually just something that was done before, written down new and applied for a patent for it because nobody did before, although it was done before. It is a risky patent, it is a weak one because once challenged from the right person it will die.*" Attached hereto as Exhibit "B" is a true and correct copy of the relevant portion of a July 2, 2014 hearing transcript in the matter of *Musion Events Ltd., et al. v. Uwe Maass*, LCIA Arbitration No. 132483.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of November, 2014, at Los Angeles, California

/s/ Todd S. Eagan
TODD S. EAGAN

1

DECLARATION OF TODD S. EAGAN RE WILLIAM JAMES ROCK'S MTN. TO DISMISS

# Exhibit "A"



Sep 15, 2013, 12:48 AM

If you don't pull out you will spend the next 10 years of your life in court chasing the rest of the peppers ghost world. I promise you. I'm sure james

did not tell you that I had a licensee meeting with 15 countries. They all have a drawing and a statement from 1999 to kill PG 2 in their country. I just

have to pull the trigger. You don't know who I am but ask my friends I always keep my promises. The only deal I can offer you. You pull out I will do m

••••oo AT&T  LTE           11:54 PM

< Back (33)        **Uwe**         Contact

did not tell you that I had a licensee meeting with 15 countries. They all have a drawing and a statement from 1999 to kill PG 2 in their country. I just

have to pull the trigger. You don't know who I am but ask my friends I always keep my promises.  The only deal I can offer you. You pull out I will do m

y best you get MJ. After that we can have a look into the future. If you don't pull out I will offer JB a licence for free if he gives me the job of the

digital MG. Your call.

Text Message              Send

# Exhibit "B"

# OPUS|2
## INTERNATIONAL

LCIA Arbitration No. 132483 - Musion Events Ltd; and Ian O'Connell v Uwe Maass; and James Rock

Day 2

July 2, 2014

Opus 2 International - Official Court Reporters

Phone:     +44 (0)20 3008 5900
Email:     transcripts@opus2international.com
Website:   http://www.opus2international.com

PULSE 003840

July 2, 2014     LCIA Arbitration No. 132483 - Musion Events Ltd; and Ian O'Connell v Uwe Maass; and James Rock     Day 2

```
 1   states as set out there.
 2   A. Yes.
 3   Q. And Mr O'Connell says that as at the date of the witness
 4      statement in these proceedings there are Peppers Ghost 2
 5      patents registered in the name of MSL in approximately
 6      50 countries. That's as at now, March 2014 in fact.
 7   A. 15 or 50?
 8   Q. 50.
 9   A. This I don't know, I don't own that patent. It never
10      got officially transferred to me.
11   Q. You don't dispute what he says though?
12   A. I don't know.
13   Q. You are aware, as you were no doubt at the time of the
14      Eyeliner Agreement, that it is a relatively lengthy
15      process from patent application to patent grant, aren't
16      you?
17   A. Some of the countries.
18   Q. So when in the Eyeliner Agreement there were references
19      to intellectual property which is owned by MSL which
20      consists of both patents and patent applications, you
21      knew that the intention was that those patent
22      applications should, in the course of time, be converted
23      into full registered patents.
24   A. Yes, that depends of the examiner of each country.
25   Q. Of course, but that was the intention. As far as --
                              173

 1   A. Absolutely.
 2   Q. -- all the parties to the Eyeliner agreement were
 3      concerned, those patents were going to --
 4   A. In the Wonderworks contract we definitely needed it.
 5   Q. They were going to blossom, hopefully, into
 6      fully-fledged patents, yes?
 7   A. Yes.
 8   Q. And going back in time then, so Mr O'Connell says that
 9      MSL carried on developing and improving the Eyeliner
10      system up until about 2011. Do you agree with that?
11   A. No.
12   Q. When do you think he stopped?
13   A. Mr O'Connell is no technical person and I believe he
14      didn't, or he is not --
15   Q. You don't think he did any element of it?
16   A. He is not able to.
17   Q. What about MSL, did MSL carry on developing and
18      improving the Eyeliner system up until 2011?
19   A. From my perspective all I would say, MSL never did
20      anything what I didn't do before, or tried before.
21   Q. Mr O'Connell refers specifically to marked improvements
22      in the invention in a number of significant ways as
23      a result of the work and development which MEL and MSL
24      undertook in the UK and the USA with specialist
25      consultants independently of any input from you. Do you
                              174

 1      agree with that?
 2   A. I remember that there was one guy, he was an engineer,
 3      and he tried to build a rolling machine what eventually
 4      didn't work and if they would have asked me I would have
 5      given a solution in ten minutes because I did it before,
 6      so they spent thousands of pounds in something which
 7      didn't work which could have been solved in ten minutes
 8      to ask me, and that happened over and over again.
 9   Q. So you are saying that that's the only instance you can
10      think of an attempted improvement and it failed. Is
11      that what you are saying?
12   A. Definitely.
13   Q. So you disagree completely with what Mr O'Connell says?
14   A. Absolutely.
15   Q. The Peppers Ghost 2 patents, is it right that those
16      included those used in what you referred to in the
17      business as digital resurrections which were used to
18      project shows showing Frank Sinatra, Tupac Shakur,
19      Les Dawson the British comedian?
20   A. What did you say, digital resurrection included in the
21      Peppers Ghost 2 patents?
22   Q. Yes, the Peppers Ghost 2 patents were used in those
23      digital resurrections?
24   A. Peppers Ghost 2 patents were used? Yes, Peppers Ghost 1
25      and Peppers Ghost 2 is, yes, of course.
                              175

 1   Q. Thank you.
 2   A. Peppers Ghost 2 is a part of Peppers Ghost 1.
 3   Q. No, they are separate patents, aren't they? They are
 4      not -- it may be they are all deployed simultaneously in
 5      the course of the business, is that what you are saying?
 6   A. Look, Peppers Ghost 2 is made to enhance the lifespan of
 7      patent protection. That was the initial thought of it.
 8      But it is actually just something what was done before,
 9      written down new and applied for a patent for it because
10      nobody did before, although it was done before. It is
11      a risky patent, it is a weak one because once challenged
12      from the right person it will die. That's the biggest
13      problem on weak patents and Peppers Ghost 2 is one of
14      those because many people can challenge that which
15      worked with me since 1998. If they would challenge
16      Peppers Ghost 2, one of the old licencees -- because
17      they did exactly that seven years before. That is
18      a dangerous patent, Peppers Ghost 2.
19   Q. You have various issues you say with the strength of
20      Peppers Ghost 2 as a patent?
21   A. It is not very strong. It is good to have and when you
22      have friends who don't challenge it, it is all good.
23   Q. All I'm asking you about, Mr Maass, is the question of
24      whether the way in which the Peppers Ghost 2 patents
25      were used in the course of the Musion business. I think
                              176
```

1  you are probably accepting that the Peppers Ghost 2
2  patents were exploited in the course of the digital
3  resurrections which I mentioned --
4  A. When it was applied for there was no digital
5  resurrection yet. It didn't exist. Nobody was thinking
6  of that.
7  Q. That's not the question I'm asking. I think I'm going
8  to move on because I think we are getting bogged down in
9  a point which probably doesn't matter. But I think
10 probably you are also saying that both the
11 Peppers Ghost 1 and the Peppers Ghost 2 patents are
12 exploited in the course of the ordinary use of the
13 Eyeliner technology by the Musion businesses?
14 A. Peppers Ghost 1 is the only valuable patent.
15 Peppers Ghost 2 is there to make its life longer for us
16 politically to say "There is still a patent" because
17 Peppers Ghost 1 dies in two years.
18 Q. From now?
19 A. From now. And Peppers Ghost 2 is still what, then
20 12 years more valid.
21 Q. We are going to disagree about which is the stronger and
22 weaker patent, but it doesn't matter.
23   Then just running through the chronology, we then
24 get to 2005, the Peppers Ghost Limited agreement which
25 has been added to the bundle today at page 665 of

177

1  bundle C2.
2  A. Do I have this?
3  Q. It will be in the box next to you probably if we haven't
4  gone to C2. It is right at the back or very close to
5  the back. Page 665.
6  A. 665 I don't have here.
7  Q. It is the wrong file.
8    Right, page 656 do you see there a document entitled
9  "Heads of agreement, Memorandum of Understanding in
10 respect of contract with pepper ghost Limited"?
11 A. Yes.
12 Q. If you turn to the second page of that you will see that
13 it is signed by you on 12 April 2005.
14 A. Yes.
15 Q. That is your signature?
16 A. That is my signature.
17 Q. And you may have heard Mr O'Connell explaining and me
18 explaining earlier on today what that document is.
19 A. Is about.
20 Q. Sorry?
21 A. What it is about, yes.
22 Q. What that document is. Do you accept that that is the
23 agreement which is referred to in the
24 Eyeliner Agreement --
25 A. I can't recall that.

178

1  Q. -- at recital D 3?
2  A. I can't recall this.
3  Q. Sorry D2.
4  A. I remember that there was a contract to protect us in
5  this form, that's why it says here "any one individual
6  has the right of veto" and remember we were talking
7  about that no one can alone decide anything, so that
8  whatever decision is made that all three of us have to
9  say "Yes, that's how we want to do it", I think that was
10 the most important thing of that document here.
11 Q. Yes, so it is an agreement which provided for unanimous
12 consent and a right of veto by anybody?
13 A. Yes.
14 Q. Same thing. Could you just turn up the very first page
15 of the Eyeliner Agreement in bundle A at the same time
16 please. Is that the Eyeliner Agreement, the heads of
17 agreement reorganisation of Eyeliner businesses?
18 A. Yes.
19 Q. If you look at the heading "Background" and go down to
20 item D.
21 A. D, "The parties have entered into various licensing and
22 cross licensing ..."
23 Q. "These agreements include but are not limited to ... 2,
24 agreement between Maass, O'Connell and Rock April 2005."
25   And Mr O'Connell says that this agreement is that

179

1  agreement, so in other words --
2  A. The 2005 one.
3  Q. The 12 April 2005 agreement which we were just looking
4  at, which is at page 665 --
5  A. It definitely had more than two pages --
6  Q. -- is the one which is referred to --
7  A. Definitely more than two pages, I mean that can't be --
8  Q. You say it can't be that agreement?
9  A. It can't be an agreement with two pages. I know
10 Mr O'Connell and when there is an appendix, there is an
11 appendix and there is not even the appendices on, so
12 what shall I say? There are two pages --
13 Q. What I want to know is two things now --
14 A. I believe that I actually might find in my things more
15 pages of this, yes.
16 Q. You might find it?
17 A. Yes.
18 Q. Okay, where would that be?
19 A. In Dubai.
20 Q. So you have relevant files in Dubai, relevant documents?
21 A. I remember that I saw that -- I don't know if they are
22 relevant because ... I'm going to have to look.
23 Q. Okay.
24 A. Maybe we have a surprise tomorrow.
25 Q. Please do, Mr Maass. Have you looked before for the

180