# EXHIBIT 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEVADA

```
 3   HOLOGRAM USA, INC., a       )
     Delaware corporation; MUSION)
 4   DAS HOLOGRAM LIMITED, a     )
     corporation organized under )
 5   the laws of the United      )
     Kingdom; and UWE MAASS, an  )
 6   individual,                 )
                                 )   Case No. 2:14-cv-772-GMN-NJK
 7              Plaintiffs,       )
                                 )   Las Vegas, Nevada
 8        vs.                    )   May 16, 2014
                                 )   2:34 p.m.
 9   PULSE ENTERTAINMENT, INC.,  )
     a Georgia corporation; JOHN )
10   C. TEXTOR, an individual;   )
     PROMETHEUS GLOBAL MEDIA,    )
11   LLC, a Delaware limited     )
     liability company; DICK     )
12   CLARK PRODUCTIONS, INC., a  )
     Delaware corporation; JOHN  )
13   BRANCA and JOHN MCCLAIN,    )
     Executors of the Estate of  )
14   Michael J. Jackson, MJJ     )
     PRODUCTIONS, INC., a        )
15   California corporation, and )
     DOES 1 through 10,          )
16                               )   Motion for Temporary Restraining
                Defendants.      )   Order
17   _____)
```

18         TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE KENT J. DAWSON
19     UNITED STATES DISTRICT COURT SENIOR JUDGE

```
20   APPEARANCES: (See page 2.)

21

22


23   Court Reporter:  Katherine Eismann, CSR, CRR, RDR
                      (702)431-1919  eismann.csr@gmail.com
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.
```

1    APPEARANCES CONTINUED:

2    For the Plaintiff:

3            CRAIG A. NEWBY, ESQ.   (By phone.)
             McDonald Carano Wilson LLP
4            2300 West Sahara Avenue, Suite 1200
             Las Vegas, Nevada 89102
5            (702)873-4100

6            RYAN G. BAKER, ESQ.   (By phone.)
             Baker Marquart LLP
7            10990 Wilshire Boulevard, Fourth Floor
             Los Angeles, California 90024
8            (424)652-7800

9    Specially Appearing for All Defendants:

10           MICHAEL N. FEDER, ESQ.
             Gordon Silver
11           3960 Howard Hughes Parkway, 9th Floor
             Las Vegas, Nevada 89169
12           (702)796-5555

13           HOWARD WEITZMAN, ESQ. (By phone.)
             GREGORY KORN, ESQ.   (By phone.)
14           JONATHAN STEINSAPIR, ESQ. (By phone.)
             Kinsella Weitzman Iser Kump & Aldisert LLP
15           808 Wilshire Boulevard, 3rd Floor
             Santa Monica, California 90401
16           (310)566-9800

17

18

19

20

21

22

23

24

25

1                (Friday, May 16, 2014, 2:34 p.m.)

2                         --oOo--

3                  P R O C E E D I N G S

4        COURTROOM ADMINISTRATOR:  This is the time set for

5 motion hearing for a temporary restraining order, Hologram USA,

6 Inc., versus Pulse Entertainment, Inc.  Case Number

7 2:14-cv-772-GMN-NJK.

8        Counsel, note your appearances for the record.

9        MR. NEWBY:  Craig Newby, McDonald Carano Wilson for

10 plaintiffs.

11        THE COURT:  Thank you.

12        MR. FEDER:  Good afternoon, Your Honor.  Michael

13 Feder from Gordon Silver specially appearing on behalf of the

14 defendants.

15        THE COURT:  Thank you.

16        MR. BAKER:  Good afternoon, Your Honor.  Ryan Baker

17 on behalf of Hologram USA, Musion Das Hologram and Uwe Maass.

18        MR. WEITZMAN:  Good afternoon, Your Honor.  Howard

19 Weitzman on behalf of all defendants.

20        MR. STEINSAPIR:  Good afternoon, Your Honor.  John

21 Steinsapir on behalf of all defendants as well.

22        MR. KORN:  Good afternoon, Your Honor.  This is

23 Gregory Korn also on behalf of all defendants.

24        THE COURT:  Thank you.  Before the Court is the

25 motion of Plaintiff Hologram USA, Musion Das Hologram Limited,

1   and Uwe Maass, an individual, for temporary restraining order.

2          The Court has received the motion or application and

3   the Court has received in the last few minutes a memorandum of

4   points and authorities in opposition to the application.

5          Have the parties all been served with the documents

6   that I have mentioned?

7          MR. WEITZMAN:  Yes, Your Honor.

8          MR. BAKER:  This is Ryan Baker, Your Honor.  And yes,

9   we have received the opposition.

10         THE COURT:  Okay.  I'll allow argument on this

11  matter.  I will point out that -- that due to the -- the way

12  this case has evolved, with the negotiations of the parties and

13  then the decision on the part of the defendants to utilize some

14  technology to -- to create a holographic image, as I understand

15  that to be their intent, there would be no opportunity or very

16  little opportunity for the plaintiffs to discover the

17  technology that is being used or proposed to be used by the

18  defendants.

19         This distinguishes the case from the pharmaceutical

20  cases where someone can obtain the product and compare its

21  composition and make a showing of infringement.  While the

22  evidence of plaintiffs is a little weak on this point, there is

23  enough there to cause the Court to concern -- the Court concern

24  that there may be some infringement.

25         As I said, due to the nature of the way the case or

1   the -- this matter has evolved, it would not be likely that the

2   plaintiffs would -- would have access to -- to be able to

3   determine whether this is a direct infringement.

4           What -- what would have been helpful is to hold an

5   evidentiary hearing on this matter.  And since the plaintiffs

6   have alleged with -- with minimal support that there is an

7   infringement and the defendants have denied that there is an

8   infringement is to have live testimony subject to

9   cross-examination.

10          As I understand it, neither of the parties are

11  prepared to present live testimony; is that correct?

12          MR. BAKER:  This is Ryan Baker, Your Honor.  And that

13  is correct.

14          MR. WEITZMAN:  And this is Howard Weitzman, Your

15  Honor.  That is correct.

16          THE COURT:  Okay.  Well, I'll hear arguments from

17  counsel at this point.

18          MR. BAKER:  Thank you, Your Honor.

19          MR. NEWBY:  I will let Ryan proceed.

20          MR. BAKER:  Ryan Baker for the plaintiffs.  And Your

21  Honor, the -- this is a situation where we are talking about an

22  event that will happen in a couple of days.

23          It's a very public event.  It will be telecast to

24  millions of people.  Last year about 10 million people saw this

25  event.  And by its very nature, the planning of such an event

1   is secret and confidential.

2            What we do know in this case and what in fact has

3   been essentially admitted by defendants is that there were

4   extensive negotiations related to the defendants' efforts to

5   acquire rights, in one form or another, to use technology that

6   is patented and which is patented under patents held by the

7   plaintiffs in this case.  And that is the Musion Eyeliner

8   technology.

9            Plaintiffs certainly understand and defendants do not

10  deny they will display a holographic image of Michael Jackson

11  on the Billboard Awards show taking place on Sunday evening.

12           This is not a situation in which a simple monetary

13  remedy can undo the damage that will be done by such a public

14  performance of one of the most successful and prominent figures

15  in the history of music.

16           The admission on this, Page 2 of the defendant's

17  brief, in the parenthetical at the end of the second paragraph

18  that in fact their contention that they are licensed is

19  telling.  They contend that they are licensed in passing in

20  order to try to dodge the conclusion which is that they are in

21  fact using the Musion Eyeliner technology.

22           Now of course as Your Honor has recognized, we have

23  not been able to go and inspect their apparatus to confirm that

24  in fact the various foils, and mirrors, and other elements of

25  the patented system are in the exact location or in an

1  equivalent location such that they are covered directly by the

2  claims of the patent, but we have had no opportunity to do

3  that.  And as a side note, at this point, Your Honor, I will

4  say that there may be an alternative or a solution if Your

5  Honor is not inclined to grant a restraining order here.

6  However, a restraining order should be granted;

7  because, again, once this performance has been made, there's

8  evidence on the record that there will be irreparable harm.

9  The evidence on the record, and it's the testimony of

10  Mr. Alvi David, makes clear that based on the actions of not

11  only the defendants in this case but other infringers, there's

12  already confusion in the market.

13  There are deals that have been interfered with and

14  certainly that will be greatly exacerbated by the performance

15  such as a Michael Jackson holograph during the Billboard Music

16  Awards.

17  We've talked about the effects of any popularity of

18  the holographs that took place and the Coachella Music Festival

19  in front of an estimated crowd of 100,000.  That performance

20  was of course licensed and in fact one of the defendants here

21  was involved with that performance, Mr. John Textor, with

22  another company that he used to work for.

23  Mr. Textor is intimately aware of the significance

24  and importance of the Musion Eyeliner technology to create the

25  type of holographic image that is needed for a performance such

1   as that of Michael Jackson during the Billboard Music Awards.

2   There is no definitive statement in any of these papers that

3   defendants are not using the Musion Eyeliner technology.

4          Again, I point out the fact that they say in a

5   parenthetical that they are licensed to use that technology.

6   Why would they say that if they are not in fact seeking to use

7   that technology.

8          The email that's attached as Exhibit A to the

9   opposition describes negotiations pursuant to which Mr. Textor

10  was attempting to acquire the rights.  He talks about a Michael

11  Jackson show.  He talks about a Michael Jackson release at some

12  point.  There's no mention of the Billboard Music Awards.  In

13  fact at the end of the email, he says, "This request for foil

14  and preparedness is just the first step."

15         THE COURT:  I would point out, counsel, that -- that

16  they do deny, at least counsel does in the opposition, that

17  the -- the plaintiffs' technology is even being used in this

18  instance.  That's at the top of the Page 8.

19         MR. BAKER:  Okay.  I read at the top of Page 8, it

20  says, "Assuming that their technology is even being used in

21  this instance, which is unproven and contested."

22         I see, Your Honor, that they -- they contest that

23  here in that sort of roundabout way.  But again, at the same

24  time, there is no denying that their client was actively trying

25  to acquire these rights for the specific purpose of a Michael

1   Jackson show.

2           Just yesterday morning we found out that in fact that

3   Michael Jackson show is in the form of the Billboard Music

4   Awards.  They of course talk about a license.  And to talk

5   about the last two prongs, the balance of hardships, it clearly

6   tilts in favor of the plaintiffs, Your Honor.

7           Plaintiffs are a company that's invested millions of

8   dollars in this technology, in acquiring these patents, in

9   building this showroom, and trying to do deals.  To allow

10  another party to essentially pirate that technology, hide its

11  production, which is only revealed days in advance of the

12  actual revelation to millions around the world, and then rely

13  on that concealment to create undue hardship simply cannot

14  stand.

15          THE COURT:  Let me ask you a question, counsel.  We

16  see holographic images on credit cards and many other things.

17  You are certainly not claiming that the patents in issue cover

18  all holographic images; are you?

19          MR. BAKER:  Not at all, Your Honor.  In fact, we

20  recognize that there are a number of types of holographic

21  images in the complaint that has been filed.  In fact we

22  reference one of the oldest holographic images known as

23  Pepper's Ghost which is widely used and is certainly not

24  covered by our patents.

25          And our patents actually cover a very specific

1    application of a holographic image which is created for the

2    exact purpose of doing something like a rapper on a stage or

3    Michael Jackson on a stage broadcast to the world at the

4    Billboard Music Awards.

5            There is no other technology that has been identified

6    or employed to create the type of holograph that's needed to

7    perform live at a concert in front of millions of people on TV

8    or anything of that nature.

9            THE COURT:  Okay.  Thank you.

10           MR. BAKER:  The last thing that I will talk about,

11   Your Honor, very briefly is the public interest.  And it's

12   clear that the public interest favors the plaintiffs in this

13   case.

14           The plaintiffs hold patents.  The defendants have

15   usurped that patented technology.  They have learned it from

16   previously having licensed the patent.  And of course the

17   contention that the defendants make that somehow we should be

18   arguing that the Tupac Shakur hologram, which was pursuant to a

19   license, should have damaged us in some way or because we don't

20   admit that it damaged us, we can't say that this one -- this

21   Michael Jackson holograph will damage us simply makes no sense.

22           There's no contention that my client should not have

23   the ability to license, lawfully provide others the rights

24   under their direction and in their discretion to exercise and

25   practice the patent.

1          THE COURT:  Well --

2          MR. BAKER:  But what harms my client is when

3   somebody -- maybe somebody who has done that in the past, does

4   that without any valid license, without any license agreement,

5   hides it from my client until the last minute when it's

6   revealed, and then says, "Well, it's too late.  We can't do

7   anything now.  The show's already been produced.  It's unfair.

8   It's going to cause us undue hardship."

9          That, Your Honor, simply creates a precedent where

10  people can conceal their wrongdoing until it's too late to do

11  anything, because then they can say it's not fair.

12         That can't be the law.  We should be allowed to, at a

13  minimum, have a -- a direct understanding of what will happen

14  on Sunday.  And as I said before, I -- there may be an

15  alternative course, but in any event, with the facts as they

16  are before the Court, Your Honor, there's no question the Court

17  should restrain the plaintiffs -- I'm sorry -- the defendants

18  from displaying any holograph of Michael Jackson during the

19  Billboard Music Awards at 5:00 p.m. on Sunday.

20         THE COURT:  Well, let's -- let's assume that they

21  just do a holograph without a live performance as you had in

22  the earlier case where the presenters were licensed.

23         Right now I don't know what they intend to do,

24  because as you've pointed out, it's under wraps and all we can

25  go on is the publicity and make some assumptions from the fact

1    that they sought to negotiate a -- some kind of an arrangement

2    with the holders of the patent.

3           But if it's just simply a display of an image of

4    Michael Jackson, your patent doesn't cover that or even simply

5    a nonmoving holograph of Michael Jackson.  So --

6           MR. BAKER:  Well, Your Honor, it may.  Certainly if

7    there's a display of an image of Michael Jackson, I -- and it's

8    not a holographic, three-dimensional image, I don't think

9    that's covered.

10          THE COURT:  Right.

11          MR. BAKER:  The holographic mechanism that's covered

12   by the in suit here is such that it's designed to enable

13   three-dimensional holographic move on the stage.  However, that

14   movement is not required.

15          In other words, a holographic image could be standing

16   there giving a -- or not moving, employing the patented

17   technology.  In this case, however, it seems fairly clear that

18   the Michael Jackson holograph will move.  I question and put

19   the question to the defendant to explain exactly what the

20   Michael Jackson holograph will do in these proceedings.

21          I -- I represent to Your Honor that it's not a

22   requirement.  If the defendants had a cutout of Michael

23   Jackson, and they put it on the stage, and there were lights

24   shining on it, it would not be covered by the patent.  So there

25   are only a few things.

1        And as Your Honor recognizes, I can't with any
2   certainty say what will happen at that Billboard Music Awards.
3   I can only say in these negotiations where the rights were
4   attempted to be obtained, the defendants have done this in the
5   past, where they have employed Musion Eyeliner technology on a
6   (inaudible) concert, and I firmly believe the facts support the
7   conclusion that they are going to do it again.
8        THE COURT:  All right.  Well, I'm going to just make
9   a remark here.  If -- if it is anything like a nonmoving
10  holograph, or a cutout, or something of that nature, it will
11  certainly not live up to the hype that the advertising for the
12  event has generated.
13        So, it would be very unusual to -- to make claims
14  that the viewing audience will see Michael Jackson as he's
15  never been seen before and then have a cardboard cutout on
16  stage.
17        Anything further, Mr. Baker?
18        MR. BAKER:  Thank you, Your Honor.  I -- I would be
19  shocked if we are going to see a cardboard cutout on stage at
20  the Billboard Music Awards.  But if that is the case and the
21  defendants will admit that that's what they are going to do, I
22  think we can resolve this fairly easily.
23        THE COURT:  Okay.
24        MR. BAKER:  But the last thing I will say is, again,
25  if the defendants intended to use different technology instead

1    of licensing the technology covered by the patents in suit,

2    they have over a month -- they've had months to inform us of

3    that in fact.

4            But instead of doing that, they tried to negotiate

5    with us to acquire the valid rights to practice the patent.

6    And when they weren't able to acquire that right, they went

7    dark, and they hid what they were doing.  And now they are

8    about to reveal it Sunday night, and the Court shouldn't let

9    them do that.

10            THE COURT:  Thank you.

11            MR. KORN:  Your Honor, this is Greg Korn on behalf of

12    the defendants.  Let me start by reminding the Court of the

13    truly extraordinary nature of the remedy that's sought here.

14            THE COURT:  I don't need to -- counsel.

15            MR. KORN:  Yes.

16            THE COURT:  I don't need to be reminded.

17            MR. KORN:  Yeah.  Thank you, Your Honor.

18            THE COURT:  Go ahead.  Go ahead with your response,

19    but --

20            MR. KORN:  The -- on the issue of the likelihood of

21    the success on the merits, we have to start with the issue of

22    the burden that's on plaintiffs to establish that this system

23    that's going to be used is an infringing system, meaning that

24    it meets every limitation of at least one claim of the patent.

25            And respectfully, I think Mr. Baker conceded it

1    pretty clearly that he has no idea if the system that's going

2    to be used is an infringing system.  He specifically said, "We

3    don't know what system they are going to use, so I don't know

4    if it meets the limitations."

5           Essentially what counsel is arguing is that if you

6    use a holographic system, then you must be infringing the

7    patent.  That has not been established.

8           I will note that contrary to what counsel

9    represented, there have been other denials that the system

10   that's going to be used is an infringing system.  I would point

11   the Court to Page 28 of docket number four, in an email from

12   Mr. Textor yesterday morning to Mr. David, stating very

13   clearly, "We are not using anything close to the patented

14   system for our upcoming show."  So that denial has been

15   consistent.

16          I will make clear to the Court that, no, it's not

17   going to be a cardboard cutout of Mr. Jackson.  It will be a

18   moving holograph.  But there is no evidence for this Court that

19   that holograph and the system that's going to be used is

20   infringing of the patents.

21          We've cited for the Court that there's no exception

22   at this stage of the preliminary injunction.  What must be done

23   in order to find the likelihood of infringement is to do a

24   limitation-by-limitation analysis of the claims to make sure

25   that each limitation is met.

1          That's not been done here.  What's being done is just
2     rampant speculation that because there were discussions between
3     the parties, that the system that's going to be used must
4     somehow infringe the patent.  That does not follow.  That's
5     just a complete guess.
6          I'll note -- and hopefully this point doesn't get too
7     esoteric.  But even to the extent that one's using this Musion
8     system, that alone doesn't demonstrate infringement.
9          I don't mean to suggest that we are using the Musion
10    system, because Mr. Textor has made it clear that we are not.
11    But even if we were, it does not follow that there's
12    infringement, because there's been no proof that that system
13    even practices the patent.
14         So, the situation we're in right now is --
15    respectfully, Your Honor does not have the slightest bit of
16    analysis -- not an ounce of analysis to establish that there
17    has or will be infringement here.  It is a total guess.  And
18    we're at risk of shutting down a major performance, as counsel
19    said, that's going to be telecast to millions of viewers
20    worldwide.
21         We are at risk of shutting that down without having
22    really any idea if there's going to be infringement.
23    Respectfully, I just --
24         THE COURT:  Well, let me ask you this, counsel.  You
25    deny that there is infringement.  Mr. Textor states that the --

1  whatever is going to happen at the awards will not infringe on

2  the patent.

3         Have you disclosed to the plaintiffs the process --

4  number one, have you disclosed to plaintiffs the process by

5  which you intent to -- to make this presentation?  And number

6  two, have you patented the technology?

7         MR. KORN:  Your Honor, let me have my colleague

8  Mr. Steinsapir answer specifically that question, because he

9  was involved in some of the events yesterday in which we

10 learned that this suit was going to be filed.

11        MR. STEINSAPIR:  So, good afternoon again, Your

12 Honor.  Jonathan Steinsapir.

13        THE COURT:  Yes.

14        MR. STEINSAPIR:  Have we shown the process to the

15 plaintiffs?  The answer is; no, we have not shown every single

16 piece of this process to the plaintiffs.  And the answer for

17 why is because we've been preparing for this very big show.

18        Secondly, the first time that the other side alleged

19 that they were going to be irreparably harmed by this show was

20 yesterday at 7:00 p.m.  We have not had any opportunity to

21 discuss those issues.

22        Secondly, why didn't we patent this ourselves?

23 Because we believe that what we are doing is in the public

24 domain.  The Pepper's Ghost holograph -- moving holograph is a

25 known method for creating moving holographs.  It has been known

1    for over a hundred years.  That's in their own patents.

2              So, the reason we have not patented this technology

3    is because we don't believe that this specific application of

4    it is patentable.

5              THE COURT:  Okay.

6              MR. KORN:  And Your Honor, this is Greg --

7              THE COURT:  Meaning -- counsel, meaning the

8    plaintiffs' -- the plaintiffs' technology or the technology

9    that you intend to use?  When you say you don't believe it's

10   patentable, obviously --

11             MR. STEINSAPIR:  Both.  Both.  But the technology

12   that we are using, which is not the plaintiffs' technology, is

13   not patentable.  We are using very well-known methods that have

14   been in the public domain for decades.

15             THE COURT:  Okay.  Now, the next question, counsel,

16   is the statement on Page 2 of the memorandum of points and

17   authorities in opposition that the defendants are licensed.  Do

18   you mean by the Jackson family to use the image, or are you

19   speaking of a licensing from the plaintiffs or some other

20   entity that holds the patents in this case?

21             MR. STEINSAPIR:  Sure.  That's a very good question.

22   And defendants -- recall we wrote this pretty quickly, but

23   defendants should have meant not the Jackson Estate.  Obviously

24   the Jackson Estate is the exclusive owner of Michael Jackson's

25   image.

1        THE COURT:  Right.

2        MR. STEINSAPIR:  But about the holograph technology,

3   I'm talking about Pulse Entertainment.  And we don't have time

4   to develop the factual record here, again, because we were just

5   told about this yesterday at 7:00 p.m.

6        But we actually understand that Pulse Entertainment

7   is licensed to these very patents by a predecessor in interest

8   to Holograph USA in the United Kingdom.  This is a foreign

9   patent by the way.  It was prosecuted in counterpart in the

10  United States.

11       So, that's all that issue is about.  And the fact

12  that we were seeking to negotiate with the other side, we were

13  seeking to negotiate the buying of foils from the other side.

14  We were not negotiating a patent license with them.  They

15  didn't point to anything that we were negotiating a patent

16  license.

17       We were buying materials from them.  We wanted to

18  work with them, but we weren't seeking to get a patent license.

19  Where is that evidence?

20       THE COURT:  Okay.  Thank you.

21       MR. KORN:  Your Honor, this is Greg Korn again.  I do

22  want to address the issue of irreparable harm, because I think

23  that's equally important and dispositive here.

24       What distinguishes this case, I believe, from the

25  cases that plaintiffs have cited is we're talking about a

1    single individual event; a single event of threatened but
2    unproven infringement, as opposed to the circumstance that you
3    see in all the cases cited by plaintiffs, in which there's an
4    ongoing, continuing accuse of infringement.
5           And in that case where you have such ongoing
6    infringement, then we can start thinking about potential for
7    price erosion, or marketplace confusion, or harm to goodwill,
8    and those sorts of things.  But what we're talking about here
9    is one event that is going to occur on this Sunday.
10          And it, we believe, strains credulity to suggest that
11   these parade of horribles are going to happen based upon that
12   single event.  And the need for injunctive relief is all that
13   much less where it's a single event when you consider that
14   plaintiffs are in the business of licensing this technology.
15          So, what we are talking about again is the single
16   possible accused infringement that can be compensated through a
17   license.  And this is for a plaintiff who is in the business of
18   licensing this technology.  There is no concern that any of the
19   defendants in this case will be continuing to compete with the
20   plaintiffs for this technology, and, therefore, could cause all
21   of those harms that have been alleged.
22          I will note as well and as we point out in the -- in
23   the papers that we filed today, there really is no evidence of
24   any of these harms.  Plaintiffs are relying on this declaration
25   from Mr. David who somehow has declared under oath that in the

1    last 24 hours, he is aware of massive amounts of consumer
2    confusion.
3         Well, he doesn't identify a single instance of
4    confusion or explain what it could be.  He's stated under oath
5    that in the last 24 hours, he has discovered the dilution of
6    his company's brand.  There is not a single fact to support
7    that.  And Mr. Baker repeated the assertion by Mr. David in his
8    declaration that there has been interference with numerous
9    potential deals.
10        Well, what deals?  What are the names of the
11   entities?  What kinds of deals?  How have they been interfered
12   by --
13        THE COURT:  Well, Mr. Korn.
14        MR. KORN:  Yes, sir.
15        THE COURT:  Mr. Korn, the problem here is that they
16   are claiming that they just got notice of what -- what is
17   happening.  I disagree with you that the fact that this is a
18   single event precludes irreparable harm, because we have to
19   consider the magnitude of the event.
20        Las Vegas is a showplace, and these shows are -- as
21   you know, go worldwide.  We have had numerous cases in this
22   district involving trade shows where it's a single -- it's on
23   the last day, and the Chinese are showing a lawnmower that is
24   confusingly similar to -- to lawnmowers made in the United
25   States, with -- with markings that are very similar.  And so

1    the fact that it's one day is not really determinative.

2         It is -- it can be the magnitude of the showing and

3    how far it goes out.  And so I think -- I think one of your

4    weaker arguments is the -- the issue of whether there can be

5    irreparable harm from an event where -- as you've advertised

6    the event is going to "present the King of Pop as he's never

7    been seen before."

8         So, I'm not real impressed with that argument.

9    However, I have some other concerns based on the earlier

10   arguments of counsel.

11         MR. KORN:  Your Honor, I understand your point

12   perfectly.  I understand that.

13         THE COURT:  Okay.  So, do you wish to respond,

14   Mr. Baker?

15         MR. BAKER:  Yes, Your Honor.  Thank you.  Briefly.

16   With regard to the likelihood of success, the defendants have

17   admitted they are using a moving holograph.  They have

18   admitted -- they've argued that they have a license, and they

19   say that they wrote the brief in a hurry.  And we've all done

20   that.  But they put that in there for a reason.

21         Mr. Textor was negotiating for the rights for a

22   reason.  He wanted the foil so that he could practice the

23   patent for which the foil is required.  We've heard, "We're not

24   using Musion, but even if we are."  We've heard lots of things

25   that don't make sense.

1           And we've heard of course that it's not fair again

2    because we've planned a big awards show, and we can't at this

3    point pull the plug.  Well, Your Honor, we are not asking them

4    to pull the plug on the award show.  There are a number of

5    artists who are performing at this award show.

6           What we're asking them to do is not infringe our

7    patent with one of those numerous performances.  Their

8    contention that they have some newfound way of creating this

9    type of a holograph, a three-dimensional, moving holograph that

10   they've admitted that is public domain, makes no sense.

11          Mr. John Textor, the defendant, never talked about

12   that.  There have been several opportunities for him to say

13   that to the plaintiffs in this case.

14          Did he come up with this last week?  And if he did,

15   counsel last night on the phone, when we spoke at 7:00 o'clock,

16   certainly could have told me about it.  And I was talking to

17   counsel before we had filed many of these papers, and there was

18   no contention that what they were doing was in the public

19   domain.

20          They told me that Mr. Textor said he wasn't going to

21   infringe.  And then they told me that he didn't -- it didn't

22   matter, because he had a license anyway, just like they say in

23   their briefs.

24          Well, the only reasonable conclusion, Your Honor, in

25   a case like this, where we have not had the opportunity to

1   investigate and examine the infringing application, is to apply

2   the reason and the discretion of the Court to reach the

3   reasonable conclusion that all these facts permit one

4   inference, and that inference is the Michael Jackson holograph,

5   the three-dimensional, moving holograph that the defendants

6   have admitted they want to put on stage on Sunday night will

7   infringe the plaintiffs' patents.

8            With regard to irreparable harm, I agree with Your

9   Honor that this is a single event, but it's a massive event.

10  It's to be viewed by millions, and not only that, just like the

11  Tupac Shakur holograph has been viewed by 30 million people on

12  line, with today's social media and the internet, any Michael

13  Jackson holograph will continue to have massive distribution

14  and viewing and shock waves around the world for a considerable

15  amount of time, and that will continue to create confusion,

16  harm my client's brand, and do irreparable harm.

17           And the last thing that I'll say again, Your Honor,

18  is -- is this idea that -- that the defendants do not intend to

19  compete with my clients after the Billboard Music Awards on

20  Sunday night is simply, for lack of a better word, nonsense.

21  Pulse, of course, that's the very nature of its business is to

22  promote and produce events like this.  That is the very reason

23  that Mr. John Textor was talking with my clients a month ago.

24           And although I'd like my clients to be able to rely

25  on counsel's statements that Mr. Textor and Pulse will not

1   compete going forward, I simply don't find that credible.

2           THE COURT:  Okay.

3           MR. BAKER:  Your Honor is also right that the single

4   event certainly was enough in the case of the -- in the *Nike*

5   case, when the shoes from China were prevented from being sold

6   at a trade show, and the facts are similar here.  Your Honor

7   should grant the temporary restraining order and with that I'll

8   submit.

9           THE COURT:  Okay.  One -- one final issue.  And I'm

10  not saying that I'm inclined to grant the TRO.  But if I am,

11  the amount of bond to be considered adequate to protect the

12  defendants, I'll hear argument on that.

13          MR. WEITZMAN:  Your Honor, if I might, this is Howard

14  Weitzman.  I have been pretty quiet and let my young partners

15  talk.  I just have one thing I want to add in response to what

16  Mr. Baker said, and if Mr. Korn and Mr. Steinsapir want to

17  respond, it would be fine.

18          I was on the conversation last night.  I'm the one

19  that represented that we -- we do not believe we were

20  infringing on any patents.  And the subject of our supposedly

21  having a license never came up during the conversation.  So I'm

22  surprised to hear that.  I'm representing to the Court that

23  wasn't part of the conversation.

24          THE COURT:  Okay.

25          MR. BAKER:  Well, Your Honor, we -- Mr. Baker here --

1    disagree with that.  And I remember it, and I'll let it be at

2    that.

3            THE COURT:  Okay.

4            MR. STEINSAPIR:  Well, I -- this is Jonathan

5    Steinsapir.  I would just say that perhaps Mr. Baker has a

6    faulty memory on this point, because we didn't even know about

7    that issue when we spoke to him.  We are the principal counsel

8    to the Estate of Michael Jackson.  We haven't spoken to John --

9            MR. WEITZMAN:  Textor.

10            MR. STEINSAPIR:  -- Textor about this issue yet.  So

11    I'm assume a mistake by Mr. Baker, but it would be literally

12    impossible for us to have raised that argument yesterday.

13            THE COURT:  Okay.

14            MR. BAKER:  Your Honor, let me just add one final

15    point, and I apologize to have to do this, but I just can't

16    resist.  I asked counsel specifically on the phone who they

17    spoke to to get the representation that their technology would

18    not infringe, and they told me John Textor.

19            THE COURT:  Okay.  Okay.  Thank you.  Argument on the

20    amount of bond if the Court is to grant the application.

21            MR. STEINSAPIR:  Well, John Steinsapir for the

22    defendants again.  Two points.  On the -- on the bond, I think

23    we would need a bond of at least a hundred million dollars.

24    And that's not an exaggeration.

25            This has been in the planning for months.  This

1  coincides with the launch of Michael's album, which, again,

2  Exhibit A to our opposition shows they were fully aware of that

3  we were going to launch a hologram at the same time that we

4  were launching our album, which they knew would be at this

5  exact time.

6          THE COURT:  Okay.

7          MR. STEINSAPIR:  So I think we need a very

8  substantial bond.  It would have to be in the 10s of millions

9  of dollars.

10         . Secondly, and just because the rule of appellate

11  procedure requires me to make this request, if you are inclined

12  to grant any sort of injunction, we would request that the

13  injunction be stayed so that we can seek relief in the Court of

14  Appeals for the Federal Circuit.

15         THE COURT:  Okay.  Thank you.

16         MR. BAKER:  Mr. Baker.  Your Honor, thank you.  In

17  the *Nike* case, I believe the injunction was in the area of

18  $10,000.

19         You've heard the defendants on the one hand say, "Oh,

20  there's not a whole lot of harm that's going to happen here.

21  This is just one television show."  And then on the other hand,

22  they say, "Well, oh.  Actually, it's a hundred million dollar

23  bond."

24         THE COURT:  That's right.

25         MR. BAKER:  Again, they are speaking out of both

1  sides of their mouth with respect.  And in this case an

2  appropriate bond amount is more along the lines of $10,000 that

3  was appropriate in the *Nike* case or something of that

4  magnitude.

5          THE COURT:  Okay.  Thank you very much.  The matter

6  will be under submission.

7          MR. STEINSAPIR:  Your Honor, we request -- I'm sorry.

8  Nothing further.

9          THE COURT:  We'll let you know today.

10          MR. STEINSAPIR:  Okay.  Thank you.

11          MR. BAKER:  Thank you, Your Honor.

12          THE COURT:  Thank you.  We are adjourned.

13      (Recess 3:16 p.m.)

14                          --oOo--

15              COURT REPORTER'S CERTIFICATE

16

17      I, KATHERINE EISMANN, Official Court Reporter, United

18  States District Court, District of Nevada, Las Vegas, Nevada,

19  certify that the foregoing is a correct transcript from the

20  record of proceedings in the above-entitled matter.

21

22  Date:  June 2, 2014.

23                      /s/ *Katherine Eismann*

24                      Katherine Eismann, CSR CRR RDR

25

# EXHIBIT 2



Neutral Citation Number: [2014] EWCA Civ 639

Case No: A2/2013/2959/2959(A) & 2959(B)

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION, COMPANIES COURT**
**The Hon Mr Justice Warren**
**No 5598 of 2013**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Wednesday 21st May 2014

Before:

**LORD JUSTICE KITCHIN**
**LORD JUSTICE FLOYD**
and
**LORD JUSTICE FULFORD**

- - - - - - - - - - - - - - - - - - - - -

**Between:**

|                                                              |              |
|--------------------------------------------------------------|--------------|
| **Ian O'Connell**                                            | **Appellant** |
| - and -                                                      |              |
| **(1) Michael David Rollings**                               | **Respond-** |
| **(2) Vivienne Elizabeth Oliver**                            | **ents**     |
| **(3) Chris Laughton**                                       |              |
| **(4) Peter Godfrey-Evans**                                  |              |
| **(as Joint Administrators of Musion Systems Limited)**      |              |

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No: 020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

Thomas Graham (instructed by Keystone Law) for the Appellant
Lexa Hilliard QC and Adam Al-Attar (instructed by Speechly Bircham LLP)
for the Respondents

Hearing date: 4 April 2014
Judgment
As Approved by the Court

Crown copyright©

**Lord Justice Kitchin:**

**Introduction**

1.      This is an appeal against the judgment of Warren J given on 25 September 2013 and his consequential order upon an application made by the respondents, as administrators of Musion Systems Limited ("MSL"), pursuant to paragraph 71 of Schedule B1 to the Insolvency Act 1986 ("the Act") for an order that they be permitted to sell the assets of MSL which were subject to a fixed charge security held by the appellant, Mr Ian O'Connell, as if they were not subject to that security.

2.      The application was made by the respondents (collectively "the Administrators") on an urgent basis and it was opposed by Mr O'Connell who asked that it be adjourned to enable him properly to prepare a response and to be represented. He also asked that the application should not be heard until after the first creditors' meeting scheduled for 30 September 2013, and preferably until after the hearing of a pending arbitration which he contended would determine whether MSL held the benefit of certain valuable intellectual property licences.

3.      The judge neither granted nor refused the adjournment Mr O'Connell sought, indicating that he could not make a ruling on the point without hearing more about the issues. Accordingly, he proceeded to hear the application. At the end of the first day, he adjourned it over until the following day to allow counsel instructed by Mr O'Connell to appear on his behalf. The hearing duly resumed the following morning with Mr O'Connell now represented by counsel, Mr Michael Smith, who was familiar with the background and who supplemented the submissions Mr O'Connell had made on the first day. At the end of his submissions, Mr Smith again asked the judge to adjourn the application. The judge then rose and, on his return a short while later, announced that he had decided to allow the application and to grant to the Administrators the relief they sought subject to the condition that there be applied towards discharging the sums secured by the charge the net proceeds of the disposal of the assets, and any additional money required to be added to the net proceeds so as to produce the amount determined by the court as the net amount which would be realised on a sale of the assets at market value. The judge indicated that he would give a reasoned judgment the following day, and that is what he did.

4.      Upon this appeal, brought with the permission of the judge, Mr O'Connell contends that the judge should have adjourned the application or should have refused it. He also seeks permission to adduce further evidence which he maintains would probably have had an important influence on the result but which he was not able to put before the judge having regard to the great speed with which the hearing was convened and the enormous difficulties with which he was faced in preparing his response to it.

**The legislative scheme**

5.      Paragraph 71 of the Schedule B1 of the Act provides, so far as relevant:

>       "(1)      The court may by order enable the administrator of a company to dispose of property which is subject to a security (other than a floating charge) as if it were not subject to the security.

(2)    An order under sub-paragraph (1) may be made only –

    (a)    on the application of the administrator, and

    (b)    where the court thinks that disposal of the property would be likely to be promote the purpose of administration in respect of the company.

(3)    An order under this paragraph is subject to the condition that there be applied towards discharging the sums secured by that security –

    (a)    the net proceeds of disposal of the property, and

    (b)    any additional money required to be added to the net proceeds so as to produce the amount determined by the court as the net amount which would be realised on a sale of the property at market value.

(4)    If an order under this paragraph relates to more than one security, application of money under sub-paragraph (3) shall be in the order of the priorities of the securities."

6.    Market value is defined by paragraph 111(1) of Schedule B1 as "the amount which would be realised on a sale of property in the open market by a willing vendor".

**The background**

7.    MSL was incorporated on 2 October 2002 and carried on business providing holographic illusion services at events organised by its customers.

8.    From October 2002 until April 2013, MSL had two directors, Mr O'Connell and Mr James Rock. On 29 April 2013 they were joined by a third director, Mr Uwe Maass. Mr O'Connell was removed as a director by a members' resolution on 30 May 2013 and Mr Rock ceased to be a director on 5 September 2013.

9.    MSL is one of a number of companies with which Mr O'Connell, Mr Rock and Mr Maass are associated. It is a wholly owned subsidiary of Musion Intellectual Property Limited, the shares in which are held equally by Mr O'Connell, Mr Rock and Mr Maass, and it conducted business in parallel, albeit in different territories, with Musion Events Limited ("MEL"), the shares in which are held equally by Mr O'Connell and Mr Rock. There are two other important matters concerning MSL which I must mention at the outset. First, Mr Rock and Mr O'Connell were charge-holders in respect of several debts allegedly owed to them by MSL under a debenture dated 14 July 2009 ("the Debenture"). Second, MSL and MEL exploited various intellectual property rights owned by Mr Maass or entities in which he had an interest and which he licensed to MSL and MEL under the terms of an agreement referred to as the "Eyeliner Agreement".

10.   The relationship between Mr Maass, Mr Rock and Mr O'Connell was initially harmonious. However, in the course of 2012 the relationship began to break down as a result, so Mr O'Connell says, of the misconduct of Mr Maass.   Attempts at mediation failed and, in April 2013, Mr Maass purported to terminate the Eyeliner Agreement. Shortly afterwards, Mr O'Connell was removed as a director of MSL.

11.   The breakdown of the relationship and the purported termination of the Eyeliner Agreement caused MSL and MEL enormous difficulties. Mr Maass contends that the termination was entirely proper and that all the intellectual property rights licensed to MSL and MEL have now reverted to him. Mr O'Connell maintains that the termination was not justified and that MSL is entitled to compensation from Mr Maass arising from his various breaches of agreement, breaches of confidence and breaches of fiduciary duty which far exceed any claims which Mr Maass has against MSL or MEL. Most importantly, however, Mr O'Connell disputes that MSL and MEL no longer enjoy a licence of the intellectual property rights owned or controlled by Mr Maass. This, amongst other issues, will, says Mr O'Connell, be determined by an arbitration proceeding before the London Court of International Arbitration (the "LCIA") which began in mid August 2013.

12.   Meanwhile, on 3 July 2013, Mr O'Connell presented a petition for the winding up of MSL.  Then, on 23 July 2013, the first and second respondents, Mr Michael Rollings and Ms Vivienne Oliver, were appointed as joint administrators by Mr Rock pursuant to the Debenture.  They took the view that an administration would achieve a better result for MSL's creditors as a whole than would be likely if the company were wound up. However, Mr O'Connell objected to their appointment on the grounds that Mr Rock had not sought or obtained his consent, as he claimed Mr Rock was bound to do under the terms of the Debenture.  At a directions hearing before Mann J on 9 August 2013, this particular aspect of the dispute was resolved by the discharge by consent of the appointment of Mr Rollings and Ms Oliver under the Debenture and their re-appointment as joint administrators by the court with effect from 23 July 2013. At the same time, and at the request of Mr O'Connell, the third and fourth respondents, Mr Christopher Laughton and Mr Peter Godfrey-Evans, were also appointed as joint administrators with effect from 9 August 2013. Mr O'Connell and Mr Rock agreed that the appointment of the Administrators would provide a practical way forward. For their part, the Administrators made mention of two matters which they anticipated would require the co-operation of Mr Rock and Mr O'Connell, namely Mr O'Connell's claim to certain foil stock in the possession of MSL, and Mr Rock's and Mr O'Connell's consent to a sale of the business and assets of MSL, assuming that was the course the Administrators decided to take. In the event, Mr O'Connell's claim to the foil stock was resolved by agreement.   However, no agreement was reached regarding the sale of the business and assets of MSL free of the Debenture, as I shall explain.

13.   Following their appointment, the Administrators continued to conduct the business of MSL as best they could.  It had about £80,000 available in cash but was incurring salary costs of some £40,000 per month and, on 27 September 2013, a quarter's rent in respect of one of the properties it occupied would fall due.  The Administrators formed the view that, in the light of the lack of available funds and the numerous disputes between the various parties to which I have referred, it was unlikely they could rescue the company as a going concern and therefore decided to continue to

trade the company for a short period in order to achieve a sale of its business and assets. They also initiated a sales process by advertising the business and assets for sale through their agents, Edward Symmons, and on the ip-bid.com website.

14. In light of the submissions advanced on behalf of Mr O'Connell on this appeal, I must now explain how the marketing process progressed. By 16 August 2013, some 29 potential purchasers had expressed interest and, of these, 14 returned signed confidentiality agreements and were supplied with details of the business.

15. The first offers were received from or on behalf of Mr Rock and Mr O'Connell. On 16 August 2013, Musion Global Limited ("MGL"), a company controlled by Mr Rock and Mr Maass, offered £250,000. Shortly afterwards, on 19 August 2013, Mr O'Connell made an offer of £300,000, of which one half would be payable on completion and the other half in three later instalments conditional upon a ratification of MSL's rights under the Eyeliner Agreement.

16. On 21 August 2013 the Administrators entered into an agreement with MEL (a company now effectively controlled by Mr O'Connell) in relation to the foil stock to which Mr O'Connell had asserted title. In light of this settlement, on 28 August 2013, MGL revised its offer to £214,000. It was, however, supported by Mr Maass who indicated that he would release debts of £800,000 which he claimed were owed to him by MSL.

17. On 29 August 2013 the Administrators wrote to Mr Rock and Mr O'Connell requesting the release of their security under the Debenture on the basis that they would require such a release to complete any sale. Agreement was not forthcoming and the following day MGL withdrew its revised offer. The Administrators were therefore left with no choice but to re-start the sales process, which they did on 31 August 2013 by inviting new offers and requesting potential bidders to state their best offer and give proof of funding by midday on 3 September 2013. Four bids were received, including one from MEL and one from MGL.

18. On 5 September 2013 the Administrators decided to accept in principle, and subject to contract, a third offer of £214,000 made by Ms Julie Benson, a former employee of MSL. That same day, however, they received an offer of £250,000 from Mr Giovanni Palma, together with a deposit of £20,000. This was supported by Mr Maass who again indicated that he would release the debt of £800,000 which he claimed was owing to him. This offer was significantly better than that of Ms Benson and so the Administrators decided to accept it, again in principle. Ms Benson then indicated that she wished to make a further and better offer and arranged for the payment of a deposit of £20,000. The payment was in fact made by Mr O'Connell, indicating that she had his backing. Anticipating an imminent sale, the Administrators' solicitors again wrote to Mr Rock and Mr O'Connell asking them to release their security under the Debenture.

19. On 6 September 2013 the Administrators invited Ms Benson and Mr Palma to submit their best and final offers by 3.00pm that day. Ms Benson offered £330,000 but was unable to provide adequate proof of funding. Mr Palma, acting through his company, Musion Das Hologram ("MDH"), offered £300,000, accompanied by the waiver by Mr Maass of his claim to £800,000. This being the better offer, the Administrators accepted it in principle with a view to completing the sale the following week.

20.   Later that same day, a new bidder emerged.  Mr John Textor, an American, acting through his company Musion Entertainment LLC, offered US $1m, with US $100,000 payable upon completion and the balance payable in quarterly instalments of US $100,000 over a period of two years commencing 90 days after completion.  The Administrators considered this offer was not viable because of the substantial deferred consideration payable over such a long period of time.

21.   On 9 September 2013 Mr Textor submitted a revised offer of US $1m, with the substantially greater sum of US $400,000 payable on completion and the remainder in quarterly instalments, as before.  The following day, Mr Textor wired a non-refundable deposit of US $40,000 which was received by the Administrators on 11 September 2013.  This offer appeared to the Administrators to be marginally better than that of Mr Palma and so they decided to proceed with it.  They had a meeting with Mr Textor on the evening of 11 September 2013.  I should add, that by this time, both Mr Rock and O'Connell had indicated they were not prepared to release their security.

22.   On the following day, 12 September 2013, Mr Textor withdrew his revised offer and instead made a further offer of US $300,000 payable on completion and then variable deferred payments depending upon the outcome of the dispute in relation to the Eyeliner Agreement.  Faced with this revised offer the Administrators decided to proceed with Mr Palma, considering that this would provide them with the greatest degree of certainty.

23.   On 13 September 2013, a number of events happened.  First, notice of a creditors' meeting to be held on 30 September 2013 was circulated to all known creditors. Second, Mr Laughton met with a representative of Mr O'Connell to discuss the release of Mr O'Connell's security.  These discussions continued on 18 September 2013.  Third, Mr Textor reinstated his earlier and more generous offer of US $1m, with US $400,000 payable on completion and US $600,000 deferred.  This led the Administrators to inform Mr Palma that they were again considering Mr Textor's offer.

24.   On 16 September 2013 Mr Textor revised his offer yet again and proposed an arrangement whereby if any of the deferred consideration of the US $600,000 was paid within 14 days of completion, then twice this sum would be deducted from the total deferred consideration payable.  The Administrators thereupon sent the sale and purchase documents to Mr Textor in what they believed to be substantially agreed form and asked for the initial consideration to be paid into their client account, to be held to Mr Textor's order.  However, it was not clear to the Administrators whether Mr Textor had any settled intention to enter into an agreement at all.  They were also concerned at the time the bidding process was taking.

25.   Accordingly, on 17 September 2013, the Administrators informed Mr Palma and Mr Textor that there would be a contract race and that the Administrators would enter into an agreement with whichever party provided the essential elements for the sale first.  They made this decision in light of what they considered to be the very similar offers they had received, the uncertainty over Mr Textor's intentions, the limited period of time for which they could continue to trade, the approaching September quarter date and their perception that they needed to provide certainty to the company's employees.

26.     On being notified of the contract race, Mr Palma acted very promptly. He put his solicitors in funds in the sum of nearly £280,000 that same afternoon and immediately travelled to London from Italy. Meetings were held with the Administrators and contracts for the sale of the business and assets of MSL to MDH were exchanged early in the morning of the following day, 18 September 2013. Importantly, Mr Palma requested and the Administrators agreed a side letter under the terms of which Mr Palma could withdraw in the event no unconditional order was made to release the security held by Mr Rock and Mr O'Connell by 5.00pm on 25 September 2013.

27.     As for Mr Textor, he did not move so swiftly. He did not provide to the Administrators all of the documents they needed and, although it is true to say that he did initiate a transfer of funds late in the evening of 17 September 2013, those funds were not received by the Administrators' solicitors until mid-morning on 18 September 2013, by which time they had exchanged contracts with Mr Palma.

**The application to the judge and his decision**

28.     Faced as they were with a refusal by Mr O'Connell and Mr Rock to release their security, on 19 September 2013, the Administrators served upon them in draft an application for an order under paragraph 71 of Schedule B1 together with supporting evidence. The following day, 20 September 2013, Mr Rock's solicitors indicated that he would consent to a release of his security. However, Mr O'Connell, by his solicitors, requested until 5.00pm on 24 September 2013 to provide a release. The Administrators responded that this was not possible because of Mr Palma's right to withdraw.

29.     On 23 September 2013, the following Monday, Mr O'Connell's solicitors again requested an extension of time. The Administrators responded granting a short extension but still the release was not forthcoming. Accordingly they issued the application returnable the following day, and notified Mr O'Connell accordingly.

30.     The application came before Warren J in the applications court on 24 September 2013 supported by the first witness statement of Mr Rollings dated 23 September 2013. The Administrators were represented by solicitors and counsel. Mr O'Connell appeared in person because his solicitor was on an aeroplane and his counsel, Mr Smith, was engaged in court elsewhere. At the outset of the hearing, Mr O'Connell requested an adjournment to give him an opportunity properly to prepare his response and be represented. The Administrators opposed that application because they were concerned that unless they were authorised to complete the sale to Mr Palma as a matter of urgency, there was a real risk it would fall through. They considered this would have been highly detrimental to MSL's creditors because the agreement with Mr Palma was the best that could be achieved in all the circumstances and, if Mr Palma were to withdraw, it was likely they would have to put MSL into liquidation.

31.     The judge was clearly placed in a very difficult position but, as I have indicated, he decided to proceed to hear the application and submissions from both sides because he felt he could not decide whether to adjourn it without so doing. However, he said that he would adjourn the application over until the following day if, at the end of the first day, he felt the need to hear from counsel on behalf of Mr O'Connell. As the judge explained, Mr O'Connell presented his case fully and effectively and, although not a lawyer, addressed him in a highly articulate and comprehensive way.

Nevertheless, at the end of the first day, the judge did indeed feel that he would be assisted by further submissions and so stood the application over. The next morning, Mr Smith appeared on behalf of Mr O'Connell and, as the judge put it, was able to supplement Mr O'Connell's submissions because he was not new to the case. At the end of the hearing on the second day, Mr Smith again asked for an adjournment, which the judge refused.   At about 3.30pm, and under pressure from the Administrators to make a decision, with the deadline expiring at 5.00pm, the judge said that he had decided to grant the application and would give his reasons the following morning.

32.   Two other matters emerged during the course of the hearing which I should mention before explaining how the judge arrived at the conclusion he did. The first concerned Mr Textor.  On the morning of the first day of the hearing, Mr O'Connell explained that he had been contacted by Mr Textor and that he had made a further offer of £300,000 for the business and assets of MSL, excluding its intellectual property rights.  Mr O'Connell said that if this offer were accepted, he would forgive part of the debt which he claimed MSL owed to him.   Then, after the lunch time adjournment, Mr O'Connell informed the judge that Mr Textor was now prepared to offer US $1m for the business and assets of MSL and that, if accepted, he, that is to say Mr O'Connell, would release £400,000 of the moneys MSL owed to him.  After the judge had risen at the end of the day, Mr Rollings telephoned Mr Textor only to be told that he had accepted the outcome of the contract race and that, since MDH had entered into a contract to purchase the business and assets of MSL, he had been liaising with Mr Palma to find a way that they could work together. He also indicated that should the application be refused and Mr Palma withdraw then he would reconsider his position.

33.   The second matter concerns another potential purchaser called Solutions Diverse. On the morning of the first day, Mr O'Connell stated that this company had made an offer.  The judge commented in his judgment on the lack of evidence as to the nature of the offer but the position has now become rather more clear.  On 17 September 2013 Mr Laughton spoke to Ms Gemma Birch, an accountant.  She indicated that she represented a client who had an interest in the business, but she did not identify the client and made no offer on its behalf.  Mr Laughton told her that, with only a few hours to go, there was little point in encouraging the client to make an offer.  Ms Birch appeared to accept this position.  On the following day, after contracts had been exchanged, Ms Birch e-mailed Mr Laughton saying that she represented a Ms Horsley and asked for her client's details to be kept on file and her interest noted in case the transaction did not complete.  Again, Ms Birch did not give details of the nature of her client's interest or the name of any corporate entity involved.

34.   On the previous day, but again after the contracts had been exchanged, Ms Oliver received a call from Mr Kevin McCook, who introduced himself as being from a company called Solutions Diverse.  He stated that Solutions Diverse was willing to pay £350,000 "up front" with a deferred payment of £100,000.  However, no further details were provided and the Administrators never had any reason to suppose that Solutions Diverse was represented by Ms Birch.  However the evidence before us now shows that was in fact the case.

35.   That brings me to the judgment given on 26 September 2013.  The judge began by setting out the background, including details of the debt owed to Mr O'Connell.  He

explained that Mr O'Connell claimed to be a secured creditor for in excess of £800,000, and that this was disputed by the Administrators although they accepted that, for the purposes of their application, this was not a matter that he needed to decide and that he should proceed on the basis that Mr O'Connell was indeed a secured creditor for the sum he claimed.

36.   The judge also gave careful consideration to the submissions advanced by and on behalf of Mr O'Connell. He noted first of all the position in relation to the Eyeliner Agreement. He fully understood that Mr Maass had purported to terminate this agreement and that Mr Maass maintained that such termination meant that the intellectual property rights previously enjoyed by MEL and MSL had reverted to him. However, Mr O'Connell disputed the validity of that termination and this issue was the subject of the LCIA arbitration. Mr O'Connell informed the judge that the result of that arbitration would be known by the beginning of December 2013 at the latest and possibly as early as October. As for the Administrators, they had not formed a view about the merits of this dispute, however they estimated MSL's rights to be worth around £100,000 if its arguments prevailed but nothing if they failed. Mr O'Connell, by contrast, asserted that MSL's rights were worth around £3m. The judge observed that he not been given any explanation as to how Mr O'Connell had arrived at this figure or what evidence there might be to support it. This is something addressed by the further evidence upon which Mr O'Connell seeks to rely before this court.

37.   The judge also had regard to a contention advanced by Mr O'Connell that Mr Maass and Mr Rock had improperly diverted business away from MEL and that they were using for their own purposes MEL's confidential information.   The judge was conscious too that Mr O'Connell believed Mr Maass and Mr Rock were closely associated with Mr Palma.

38.   The final matter to which the judge gave careful consideration was the submission by Mr O'Connell that both Mr Textor and Solutions Diverse were ready and willing to make better offers than that of Mr Palma. So far as Mr Textor was concerned, the judge was provided by Mr O'Connell with details of the telephone conversations he had had with Mr Textor on the first day of the hearing. However, on the second day he was also provided by Mr Rollings with a further witness statement setting out the substance of the conversations that he had had with Mr Textor after court on the first day. In the result, the judge felt that he could not say with any great confidence that a better offer from Mr Textor would become available. As for Solutions Diverse, the judge observed he had no evidence whatsoever of the nature of any offer made by this company. The judge recorded that the Administrators had not heard from this bidder at all. In this particular and limited respect, the judge was not provided with the full picture and this is a matter to which I must return.

39.   The judge said he had found the decision a very difficult one to make and, as he put it, "the balance could not be finer". However, notwithstanding the submissions advanced by Mr O'Connell, he had come to the conclusion that he should make the order sought by the Administrators for the following reasons. First, the bid process was open and fair. Second, the Administrators needed an order under paragraph 71 of Schedule B1 in order to allow them to complete the sale of the business and assets. Third, there was no better offer on the table than that of Mr Palma. Fourth, there was a risk of losing the sale if he did not make the order sought. That risk might be small but it

was nevertheless real. Fifth, the sale would not deprive MSL of any claim against any third party because such claims were not included within the assets the subject of the sale agreement. The purpose of the administration would be promoted by the completion of the sale and Mr O'Connell was not entitled to control the timing of the realisation of his security, at least in the context of a situation in which the result of the LCIA arbitration might not be known until December 2013. Finally, the Administrators were entitled to have regard to the problems they would face in trying to continue to trade the business until that time, particularly having regard to the need to pay rent and the salaries of MSL's staff.

**The appeal**

40.     Mr O'Connell has been represented on this appeal by Mr Thomas Graham. His submissions to us were directed to first, Mr O'Connell's application to adduce further evidence; and second, the substantive appeal. In addressing the substantive appeal, Mr Graham focused upon Mr O'Connell's contention that the judge ought to have refused the application. However, he made clear that Mr O'Connell also maintained his contention that, in the alternative, the judge should not have abridged time and should have adjourned the application.

41.     The Administrators have been represented on this appeal by Ms Lexa Hilliard QC and Mr Adam Al-Attar. Ms Hilliard invited us to refuse the application to adduce further evidence or, if we were minded to admit it, to allow the Administrators to rely upon evidence in response. As for the substantive appeal, she submitted that the judge was entitled to exercise his discretion as he did and that no proper basis has been shown for this court to interfere with his decision. She also explained that, so far as necessary, the Administrators relied upon the matters raised in their respondents' notice as providing a further reason for upholding the judge's decision, namely that Mr O'Connell was never in fact a secured creditor in respect of debts of £800,000, or anything approaching that figure.

*The further evidence*

42.     The further evidence which Mr O'Connell wishes to introduce is contained in his second witness statement dated 16 October 2013 and falls into four parts. The first concerns the LCIA arbitration. Here Mr O'Connell refers to correspondence with the LCIA which confirms the receipt on 21 August 2013 of a request for arbitration dated 14 August 2013, and of the registration fee. Mr Graham emphasised that, although MSL is not a party to the arbitration, it will determine whether the intellectual property licences granted to MSL survived the purported termination of the Eyeliner Agreement by Mr Maass and consequently its outcome will have a significant effect upon the value of MSL's intellectual property rights. However, he also explained that, contrary to expectations, the substantive hearing of the arbitration has not yet taken place and will not do so for at least another two months.

43.     The second part concerns the value of MSL's intellectual property rights. As I have explained, the Administrators valued those rights at about £100,000. Mr O'Connell says that this is significantly less than they were worth and relies in support upon various contracts between MSL and its customers, the income those contracts generated, the revenues MSL generated by licensing its intellectual property rights in the years to 2012, and details of a contract which MSL was negotiating in early 2013.

44.   The third part concerns the sums secured by the Debenture.  Here Mr O'Connell refers to certain correspondence with the Administrators' solicitors after the hearing before the judge in which he set out his claim that further debts totalling in excess of £111,000 were secured. In further correspondence since the date of the witness statement this figure has grown to about £240,000.

45.   The final part concerns the position of Solutions Diverse. Mr O'Connell explains that Solutions Diverse did not become aware of the administration until 12 September 2013 and expressed its interest in purchasing the business and assets of MSL on 17 and 18 September 2013.  This evidence therefore supports the submissions made by Mr O'Connell to the judge at the hearing and which he dealt with in the manner I have described.

46.   The Administrators vigorously opposed the admission of this evidence on the grounds that it is, in part, not admissible; that it is disputed; and that, in any event, it cannot be said that it would probably have had an important influence on the result of the hearing.  Despite these points which were all advanced powerfully by Ms Hilliard on the Administrators' behalf, I would admit this evidence in the unusual circumstances of this case.  The hearing took place at short notice and this rendered it very difficult for Mr O'Connell to assemble all of the evidence upon which he wished to rely; it does bear upon and is relevant to the issues the judge had to decide; and it is apparently credible, though I recognise that it is disputed.  In all these circumstances I believe it would be just to allow Mr O'Connell to rely upon it.  However, I also believe that, this being so, the Administrators should have the opportunity to rely upon the responsive evidence contained in the third witness statement of Mr Rollings dated 2 November 2013.  Mr Graham made clear that, if we were to admit Mr O'Connell's further evidence, he would have no objection to the admission of Mr Rollings' further evidence. Accordingly, I would admit that too.

*Should the judge have refused the application?*

47.   Mr Graham contended that the judge should have refused the application and that he fell into error in seven different respects, each of which forms a separate ground of appeal.  As I will explain, Mr Graham focused particularly on the fourth of these in his oral submissions to us.  Nevertheless all of the grounds are maintained so I will address them in turn.  Before doing so I would, however, emphasise one important and over-arching point.  It is not and has never been suggested that the judge did not have jurisdiction to exercise his discretion under paragraph 71 of Schedule B1. The jurisdiction to exercise the discretion conferred by that paragraph arises if the sale in issue is "likely to promote the purpose of the administration in respect of the company".  The judge held that it was and there is no appeal against that finding.  Mr Graham's criticisms were all directed at the exercise by the judge of his discretion to make the order sought.  That necessarily involves inviting this court to find that the judge erred in principle in approaching the matter as he did, or that he left out of account, or took into account, some features that he should, or should not, have considered, or that his decision was wholly wrong.  Mr Graham accepted that that was so but contended that the judge did indeed fall into error in such a way in each of the respects identified in Mr O'Connell's grounds of appeal.

48.   The first of those grounds is that the Administrators failed to produce any or any adequate evidence as to the value of the sums secured by the Debenture; or that there

would be sufficient funds available to pay Mr O'Connell the sums so secured. Mr Graham submitted that, as a result of the lack of such evidence, the judge was unable to carry out a fair and proper assessment of the extent of the prejudice that would be caused to Mr O'Connell by granting the Administrators the relief they sought, and accordingly he erred in principle.

49.     In assessing this contention, I think that the following points are material. First, Mr Rock having released his security on the basis of the proposed sale to Mr Palma, the only secured creditor was Mr O'Connell. As I have explained, Mr O'Connell claimed to be a secured creditor in respect of debts in excess of £800,000 and, although this was and is disputed by the Administrators, they accepted that, for the purposes of the application, and in the light of the limited time available for the hearing, the judge should assume that it was. The judge therefore proceeded on the basis that Mr O'Connell was secured to the extent he claimed. Second, Mr Rollings exhibited to his second witness statement dated 25 September 2013 a comparison of outcomes which showed that the Administrators expected to achieve £355,860 if the application was granted but only £111,119 if it was refused and the Administrators had to place MSL into liquidation and sell the assets on a break up basis. Third, it was therefore perfectly clear that the net proceeds of sale would not exceed the sums which Mr O'Connell claimed were secured by the Debenture. I do not, however, accept that the judge was, in these circumstances, bound to refuse the application. Rather, he was required to satisfy himself that the Administrators were proposing to sell the business and assets of MSL for a proper price and to consider the balance of relative prejudice, that is to say the prejudice to Mr O'Connell if he made the order sought against the prejudice to all those interested in the promotion of the purposes of the administration if he refused it. As Knox J explained in *Re AVR v Aviation Ltd* [1989] BCLC 664 at 669:

>     "The court has to make a balancing exercise between the prejudice that will be felt if the order is made by the secured creditor, against the prejudice that would be felt by those interested in the promotion of the purposes specified in the administration order if it is not."

50.     This, it seems to me, is precisely what the judge did. As I will elaborate in addressing the other grounds of appeal, he satisfied himself that the Administrators were proposing to sell the business and assets at a proper price and then he undertook the required balancing exercise, and in so doing had proper regard to the prejudice that would be suffered by Mr O'Connell if he made the order, and also to the prejudice that would be suffered by all those interested in the promotion of the purposes of the administration if he did not.

51.     The first ground of appeal is supplemented by the second which relies upon the further evidence contained in Mr O'Connell's second witness statement which I would permit him to rely upon for the reasons I have given. Mr O'Connell explains in that witness statement how a further sum in excess of £111,400 is due and owing to him and secured by the Debenture in addition to the £800,000 upon which he relied before the judge. As I have said, that figure has now risen to about £240,000. Once again, this is disputed but, for the purpose of this appeal, I am prepared to assume that Mr O'Connell's claim is justified. I do not, however, believe that this would have had any effect upon the way the judge exercised his discretion because the £800,000 of

secured debt already materially exceeded the sum of £300,000 which Mr Palma was prepared to pay.

52.     The third ground concerns the impact of the LCIA arbitration. Mr Graham submitted that it will be decided in the arbitration whether the intellectual property licences granted to MSL survived the purported termination by Mr Maass of the Eyeliner Agreement.   The result of the arbitration will, Mr Graham continued, have an overwhelming impact on the value of MSL's assets and yet the Administrators failed to carry out any investigation into the merits or value of the claim. Moreover, as a debenture holder, Mr O'Connell had the right to decide when to exercise his rights, yet they were overridden by the judge's order.

53.     The fundamental difficulty with this submission is that the Administrators were far from sure that the arbitration could and would be concluded within a relatively short timescale. Mr O'Connell was confident that the substantive hearing would take place before 5 December 2013 and probably a good deal earlier but the Administrators were rather more cautious in their approach, and rightly so as it has turned out for, as I have explained, the hearing has still not taken place; nor has a date for that hearing been fixed. Moreover, in mid September 2013, the Administrators knew that MSL could only continue to trade for a relatively short period of time. It had limited funds, was occupying two premises with quarter-day rental payments about to fall due on both premises, and had 17 employees. In these circumstances the Administrators formed the entirely reasonable view that, unless they could sell the business and assets on a going concern basis, they would have to place the company into liquidation, and that would mean selling its assets on a forced sale basis. They therefore had no choice but to try and sell the assets and business, such as they were, with an inevitable associated uncertainty about their value. As Ms Hilliard put it, Mr O'Connell may win or lose the arbitration but, if he loses, MSL's intellectual property rights will be shown to have had little or no value at all. I of course accept that the order made by the judge amounted to a significant interference with Mr O'Connell's rights as a fixed charge holder to realise his security at a time and in a manner of his own choosing, but this is the inevitable consequence of an order under paragraph 71 of Schedule B1 in a case where the fixed charge holder objects to the sale. In such a case the prejudice to the charge holder caused by the making of an order must be balanced against the interests of those interested in the promotion of the purposes of the administration, just as the judge did.

54.     That brings me to the fourth ground of appeal, and the one upon which Mr Graham placed particular reliance at the hearing.  He contended that the judge should have refused the application on the basis that the proposed sale of the business and assets would not achieve a proper price having regard, in particular, to the value of its intellectual property rights.    To the contrary, continued Mr Graham, the Administrators chose to conduct an unfair and unjustified contract race; they accepted Mr Palma's offer which was lower than that of Mr Textor; Mr Textor's bid was still available at the date of the hearing; and Mr Maass deliberately and wrongfully depressed the market by intimidating Mr Textor, as the judge was or should have been aware.   Moreover, there were other offers in the wings and consequently the Administrators had every reason to suppose they would secure another and better offer than that of Mr Palma were they to go back to the market. In short, there was, submitted Mr Graham, no proper investigation of the value of the assets of the

business and, in particular, its intellectual property rights. Further, the Administrators carried out no adequate investigation of the diversion of the assets of the business by Mr Maass and Mr Rock by way of asset stripping.

55.    Attractively and forcefully though Mr Graham advanced these submissions, I have found myself unable to accept them. Starting with the contention that the Administrators conducted an unfair contract race, I accept that this was announced on 17 September 2013 without prior warning. I also recognise that Mr Palma was able to board an aeroplane in Italy and arrive in London that same day, whereas Mr Textor had no such opportunity, resident as he was in the United States. However, it must be remembered that Mr Textor had been aware of the marketing process for some time, having made his first offer on 6 September 2013. Further, he had made a total of five different offers by 16 September 2013. He had had his second offer accepted in principle on 11 September 2013 only to withdraw it the following day. Then, on 13 September 2013, he had reinstated his previous offer, revised it again on 16 September 2013 and been sent sales documentation for him to execute. He was, therefore, intimately familiar with the issues by 17 September 2013 and had instructed lawyers to act for him. Accordingly and while it is entirely true to say that he could not travel from the US to England on 17 September, there was no reason at all why he could not have exchanged contracts, had he so wished. Further, it is notable that he has never himself complained that the procedure initiated by the Administrators was unfair.

56.    As for the contention the contract race was unjustified, it seems to me the following points are material. The marketing process was initiated on 9 August 2013 and yet by 17 September 2013 the Administrators still had no firm offer. Further, the Administrators knew that they might well have to make an application to the court under paragraph 71 of Schedule B1; they had limited cash available to them; they were continuing to incur liabilities to the 17 employees in the business; and they knew that on 27 September 2013 another quarter-day rental payment would become due and payable. Faced as they were with diminishing assets and no firm commitment, the Administrators sought to crystallise the situation and bring some finality to the marketing process, and they did so by announcing a contract race. In the circumstances I do not think they can be criticised for so doing.

57.    Mr Graham's next submission was closely related to those I have addressed. He argued that Mr Textor's bid was plainly higher than that of Mr Palma and that the Administrators should therefore have favoured him and given him more time to enter into a binding agreement. I do not accept this was so. Mr Textor's offer would involve an initial payment of, so we were told, around £240,000 at the exchange rate of the time, with the balance deferred. It seems to me the Administrators had every reason to be cautious about this deferred consideration bearing in mind the potential difficulties associated with enforcement, particularly against a US corporation. Further and importantly, by 17 September 2013 it was unclear to the Administrators whether Mr Textor had any settled intention to enter into a binding agreement at all. They knew too that if either Mr Palma or Mr Textor withdrew then it was likely the other would take the opportunity to revise his offer. I consider that the Administrators were therefore entitled to take the view they did on the morning of 18 September 2013 that they should accept Mr Palma's offer.

58.     Mr Graham then submitted that Mr Textor's offer was never withdrawn and he was plainly willing and available to negotiate with the Administrators at any time and certainly throughout the two days of the hearing before the judge. I am prepared to accept that this was indeed the case. Certainly, on the first day of the hearing Mr O'Connell related to the judge that Mr Textor had made a further and higher offer for the business and assets. However, it must also be borne in mind that, at the end of that day, the Administrators themselves telephoned Mr Textor and in the course of their conversation Mr Textor did not confirm the offer Mr O'Connell had earlier related but said he was content to abide by the outcome of the contract race and looked forward to finding a way to work with Mr Palma. Accordingly, and while Mr Textor did indeed express his continuing interest should the sale to Mr Palma fall through, it seems to me far less certain what the terms of any offer Mr Textor might then have been prepared to make would have been. Certainly I do not believe the Administrators had any solid reason to believe it would be higher than that of Mr Palma.

59.     That brings me to the fourth aspect of Mr Graham's submissions, namely that Mr Maass intimidated Mr Textor and thereby depressed the market. Further, continued Mr Graham, this was something the judge failed to take into account. I recognise that the considerable uncertainty about the intellectual property rights previously enjoyed by MSL was the consequence of the action taken by Mr Maass to terminate the Eyeliner Agreement. I also accept that this did have a significant effect upon the value of the business and assets of MSL in September 2013 and reduced the price which any bidder was prepared to pay for them. Whether Mr Maass was entitled to terminate the Eyeliner Agreement is an issue which will be decided in the arbitration. However, I am not persuaded that any other action taken by Mr Maass affected the price which Mr Textor was prepared to offer and certainly nothing said by Mr Maass seems to have deterred Mr Textor or caused him any particular concern because, as he said to the Administrators at the end of the first day of the hearing, he was content to abide by the outcome of the contract race and was looking forward to finding a way to work with Mr Palma.

60.     I must now address the submission that there were other offers available and that this demonstrates that this was, in truth, a vibrant market and that the Administrators therefore had no justification in seeking to push forward with the offer made by Mr Palma and to make the application on short notice in the manner they did. Here Mr Graham relied in particular upon the offer from Solutions Diverse on 18 September 2013 to pay a total of £450,000 of which £100,000 would be deferred. This matter, referred to by Mr Rollings in his third witness statement of 5 November 2013, was not drawn to the attention of the judge. To the contrary, he was told by Mr Al-Attar on the first day of the hearing that the Administrators had not heard from this company. It is now tolerably clear that Mr Al-Attar's instructions on this point were not correct. He and those present in court were aware of the discussions with Ms Birch but, at that stage, had no reason to suppose that her client was Solutions Diverse. Ms Oliver, who had the conversation with Mr McCook of Solutions Diverse was, regrettably, not present in court and she had not conveyed the substance of her telephone conversation with Mr McCook to those who were. In this respect there was an unfortunate breakdown in communication.

61.   Ms Hilliard accepted that the information conveyed to the judge was wrong and apologised.  However, she explained that this lapse was not deliberate and emphasised that the Administrators had no idea whether or not Solutions Diverse was an entity with any real interest or, indeed, ability to pursue a bid.  This is, I think, a fair point and, bearing in mind that Mr McCook's offer and the communications from Ms Birch had come so late in the day and were so ill defined, it seems to me the Administrators were justified in attaching little weight to them and, most importantly, I do not believe that, had the judge been provided with full information, it would have affected the exercise of his discretion in any way.

62.   I come then to the investigation of the value of the assets.  The parties are agreed that it was incumbent upon the Administrators to obtain on the sale the proper and fair value of the business and assets they were selling.  However, there was a sharp disagreement between them as whether or not this is something the Administrators achieved.  Mr Graham relied for this purpose upon the third witness statement of Mr O'Connell in which he explained that MSL entered into two new licence agreements in 2012, one with an Indian company called Kasu Mani Enterprises Private Limited and another with a Slovenian company called Elekroncek dd.  These agreements generated licence fees and a revenue stream based upon the number of holographic displays each company installed.  Mr O'Connell also gave evidence that, over the previous five years, its gross revenue from licensing its IP rights amounted to in excess of £7,800,000.  Finally, he explained that, in early 2013, MSL was negotiating for a new licence which had a potential value to MSL of around £6m.  In light of all these matters Mr O'Connell valued the company's intellectual property rights at around £3m, and certainly very substantially more than the Administrators achieved.

63.   This is powerful evidence.  However, it suffers from the fundamental problem that the purported termination of the Eyeliner Agreement by Mr Maass had a devastating impact upon MSL's business.  It therefore seems to me that evidence of the value of the business before the relationship between the various protagonists deteriorated is of little assistance in determining its value once it had.  Instead, the Administrators ascertained the value by undertaking a wide and extensive marketing exercise.  They placed adverts on appropriate websites, received 29 expressions of interest and 14 prospective purchasers were provided with information regarding MSL's business.  But ultimately all of this interest translated into just a few offers.  MGL withdrew in the manner I have described leaving Mr Textor and Mr Palma, both of whom made offers which were, in the Administrators' eyes, very similar.  I am therefore satisfied that the Administrators did ascertain the value of the business and assets of the company, including its intellectual property rights, such as they were, by testing the market, and doing so in a perfectly sensible and adequate way.  Faced with rising costs and diminishing assets, they were naturally concerned to secure a sale as soon as reasonably possible.  That is precisely what they did and I am satisfied that, in doing so, they obtained a proper price.

64.   The final matter relied upon by Mr Graham under this ground of appeal is that the Administrators failed to investigate potential claims by MSL against Mr Maass and Mr Rock and, in particular, took no adequate steps to recover assets and opportunities improperly diverted from the business.

65.   Ms Hilliard's response to this submission, which I accept, is that the benefit of any actual or potential claim against third parties falls within the assets excluded from the

sale and the right to pursue such claims remains vested in MSL. However the Administrators face the difficulty that they do not have and have never had the funds to pursue any such claims. They only ever had two options, one being to try and sell the assets and business of MSL on a going concern basis for the best price they could achieve and the other being to place the company into liquidation. They took the former because this was, as all parties accepted, likely to produce a better result for the creditors than the latter.

66.     Drawing the threads together, I reject the fourth ground of appeal. I am satisfied that the Administrators did achieve a proper price for the business and assets of MSL; that the offers of Mr Palma and Mr Textor were comparable and that the Administrators were entitled to conduct a contract race and to accept Mr Palma's offer in the way they did.

67.     The fifth and sixth grounds of appeal relied upon by Mr O'Connell are directed to rather wider issues, some of which I have addressed earlier in this judgment. But there are two particular matters to which I have not yet referred. First, Mr O'Connell contends that the judge ought to have had regard to the fact that the assets proposed to be sold included electronic equipment containing, or at least giving access to, data which was the confidential proprietary information of MEL and that for this information to fall into the hands of a third party purchaser would be extremely damaging to MEL. Second, he contends that the assets proposed to be sold included physical property owned by MEL.

68.     I can deal with these matters quite shortly. The Administrators have not in fact sold any assets or property belonging to MEL. They only sold such assets used by MSL as that company actually owned. The Administrators were, however, conscious of the need to protect any confidential information belonging to MEL and not to permit it to fall into the hands of Mr Palma. Indeed, this was something to which the judge specifically referred in paragraph 12 of his judgment. However, as he explained, this did not go so much to the merits of the application as to the mechanics of the completion of the sale.

69.     Mr O'Connell's seventh ground of appeal is that the judge ought to have refused the application because it was overwhelmingly likely that the unsecured creditors of MSL would receive no dividend. Mr O'Connell contends that, in practice, the Administrators had no constituency to serve other than the secured creditors, of which he was the only one, and that in these circumstances the matters he relied upon and the prejudice he would suffer from the proposed sale should have been given particular weight.

70.     I accept that, on the basis of the proposed sale to Mr Palma and the release by Mr Rock of his security, Mr O'Connell was the only secured creditor and accordingly his interests were a matter to which the Administrators had to have particular regard, but I do not accept this meant the Administrators were precluded from agreeing the sale to Mr Palma without Mr O'Connell's consent. It is accepted that the judge had jurisdiction under paragraph 71 of Schedule B1 to make the order sought because he was satisfied that the sale was likely to promote the purposes of the administration, namely to achieve a better result for the creditors as a whole than an immediate winding up. The question then was how the discretion that provision conferred upon him should be exercised. The judge balanced, as he was bound to, the prejudice that

would be suffered by Mr O'Connell if he made the order against the prejudice that would be felt by all those interested in the promotion of the purposes specified in the administration if he did not. In considering the latter, the judge properly took into account that the Administrators had engaged in a process which would leave Mr O'Connell no worse off than if he had sold the assets secured by the Debenture himself, and also the interests of all other creditors and potential creditors, including the employees of the company and its landlords. Everybody agreed that an administration would achieve a better result for the creditors as a whole than would be likely if the company were wound up and that an administration would necessarily involve, in due course, a sale of the assets and business of the company on a going concern basis for the best price that could be achieved. That is precisely what the Administrators sought to do.

71.     The eighth and final ground of appeal relied upon by Mr O'Connell is that both he and the judge were led to believe that Mr Maass, as a purported creditor of MSL in a sum exceeding £800,000, had agreed to waive all his claims against the company if the sale to Mr Palma proceeded to completion. In fact, however, and while Mr Maass did indeed waive his claims against MSL, he nevertheless retained all his voting rights as a purported creditor and this was a matter of which Mr O'Connell was unaware until after the hearing. In due course Mr Maass exercised those voting rights at the creditors' meeting which was ultimately held on 14 October 2013 with the result that Mr O'Connell and his supporters were outvoted.

72.     It is true the judge was not aware of the retention by Mr Maass of his voting rights and that he did in due course exercise them at the creditors' meeting. I also recognise that, in consequence of the retention by Mr Maass of his voting rights, Mr O'Connell was unable to carry a majority at the meeting. Nevertheless, I do not believe this provides a basis for overturning the judge's decision. First, Mr Maass was under no obligation to waive his voting rights and there was no basis for compelling him to do so. He retained those voting rights, as was his right, and then, in due course, chose to exercise them in the way that he did. Second, I accept that the retention by Mr Maass of his voting rights was not a matter to which the judge's attention was specifically drawn. But that, it seems to me, is neither nor there. Had the judge's attention been drawn to this matter, it could not have led him to exercise his discretion in any different way. Indeed, if anything, it would have reinforced the decision to which he came for it would have rendered it that much less likely Mr O'Connell would be able to carry a majority.

73.     As I have said, the judge found the decision with which he was faced an extremely difficult one to make. That I can well understand. However, I am satisfied that he approached the matter correctly, properly took into account those matters to which he was bound to have regard and came to a conclusion which fell well within the bounds of a reasonable exercise of his discretion. I do not believe there is any proper basis for this court to interfere with it.

*Should the judge have adjourned the application?*

74.     Mr O'Connell contends that the judge was wrong to abridge time and that he should have adjourned the application to enable him to be represented and to have a fair and proper opportunity to respond to it, or until after the imminent creditors' meeting, or

until after the conclusion of the LCIA arbitration. I will deal with these three contentions in turn.

75.     Mr Graham developed the first of these grounds in the following way. He emphasised that the application was issued on Monday 23 September and made returnable the following day. Neither Mr O'Connell's counsel nor his solicitor was available and the judge had no skeleton argument from Mr O'Connell because there was no time to prepare one. Mr O'Connell's witness statement was prepared at short notice and lacked focus. It was 55 pages long and much of it had been cut and pasted from statements prepared for earlier applications. It was not served until the morning of the hearing and the judge had no time to read it. Accordingly Mr O'Connell attended on that first day but sought an adjournment to give him an opportunity to prepare his response properly and be represented. The judge did not accede to that request and instead proceeded to hear the application although, as I have said, it was, later in the day, adjourned until the following day to allow counsel, Mr Smith, to appear on Mr O'Connell's behalf. Further, Mr Graham continued, there was no real urgency and certainly no sufficient urgency to justify depriving Mr O'Connell of his right to a fair hearing.

76.     I entirely accept that the hearing took place before the judge in circumstances which were far from ideal. I also accept that Mr O'Connell was placed in an extremely difficult position which he dealt with as best he could. I may say that, despite the formidable challenge with which he was presented, a review of the transcript reveals that he acquitted himself with distinction and clearly articulated the objections to the order which have been developed more fully on his behalf on this appeal. Further, looking at the matter more broadly, as Ms Hilliard has invited us to, it must be borne in mind that Mr O'Connell had been aware for some time that an application would have to be made if he declined to release his security. This was raised at the hearing before Mann J and pursued by the Administrators with Mr O'Connell as the marketing process unfolded. Further, the application and evidence were served upon Mr O'Connell in draft on 19 September 2013, four clear days before the hearing, albeit that period included a weekend. The judge was also conscious of the difficulties facing Mr O'Connell on the first day and, recognising that he would be assisted by hearing submissions from Mr O'Connell's counsel, adjourned the application over until the second day.

77.     Further, for all the reasons I have explained, the application was indeed urgent. Mr Palma required the side letter because he was not prepared to purchase the business and assets of MSL subject to the Debenture. That side letter required the Administrators to secure an order of the court under paragraph 71 of Schedule B1 by close of business on 25 September 2013. Had the order not been granted, there was, as the judge recognised, a real risk that Mr Palma would withdraw. That would have meant a further marketing exercise of uncertain outcome and the likely accrual of a further rental liability of around £30,875 which was, as the judge noted, no small sum in the context of this particular administration. To that would have had to be added the payroll for September which was, in the event, paid by Mr Palma. In all these circumstances I do not believe it can be said that the judge fell into error in exercising his discretion to case manage the application in the way that he did.

78.     Mr Graham then turned to the alternative contention that the judge ought to have adjourned the hearing of the application until after the creditors' meeting which was

due to held on 30 September 2013. This was a matter to which the judge was not prepared to attach great weight because, as he put it at paragraph 14 of his judgment, there was no firm, or even something approaching a firm, alternative offer. Nevertheless Mr Graham submitted that the views of the creditors about the proposed sale were highly material and the judge ought to have adjourned the application so as to allow them to be expressed.  In support of this submission he referred us to *Re Consumer & Industrial Press Ltd (No 2)* [1988] 4 BCC 72, a decision under the former administration regime. In that case Peter Gibson J refused an application by administrators for an order under s.15 of the Act authorising them to dispose of property subject to fixed charges, and he did so because the administrators' proposals had not been put to a meeting of creditors.  He said (at page 73):

> "I am very unhappy indeed at the suggestion that the court should make an order such as will mean that there can be no useful meeting of creditors.  It seems to me that the power the court undoubtedly has under sec. 15 should only be exercised in circumstances in which it can readily be seen that the disposals are really the only sensible course to be adopted and when unsecured creditors have had a chance to say what they think about the proposals in the administration.  It seems to me that quite exceptional circumstances would be needed for the court to frustrate a meeting of creditors to consider proposals by the administrators."

79.    Recent decisions, however, have seen the adoption of a more pragmatic approach to the commercial pressures facing administrators. Thus in *In re T & D Industries Plc* [2000] 1 WLR 646, Neuberger J considered whether administrators might dispose of the assets and undertaking of a company prior to the meeting of creditors and, if so, whether the court should give directions to sanction such a sale.  After referring to the decision of Vinelott J in *In re Charnley Davies Ltd* (unreported), 21 January 1987, the decision of Millett J in *In re Charnley Davies (No. 2)* [1990] BCLC 760, his own decision in *In re Montin Ltd* [1999] 1 BCLC 663 and the decision of Rimer J in *In re Osmosis Group Ltd* (unreported), 25 May 1999, Neuberger J explained (at page 657):

> "Faced with a course which the administrator was advised, and believed, was highly beneficial to the company, where the course had to be taken very quickly because the proposed purchaser would otherwise withdraw, Rimer J., like me in *In re Montin Ltd.* [1999] 1 B.C.L.C. 663, appears to have felt that he had little real alternative in effect but to sanction the proposal. This tends to emphasise the point mentioned earlier, namely that in the great majority of cases it seems a little difficult for the court to do anything other than sanction a commercial decision which the administrator reasonably and, on the face of it, justifiably wishes to make."

A little later Neuberger J emphasised the desirability, indeed need, for administrators to put their proposals to creditors, and to call a meeting as soon as reasonably possible before continuing (at page 657):

> "[M]y decision tends to emphasise the fact that a person appointed to act as an administrator may be called upon to make important and urgent decisions. He has a responsible and potentially demanding role. Commercial and administrative decisions are for him, and the court is not there to act as a sort of bomb shelter for him.

> [A]dministrators should not be able to take unfair advantage of the fact that the creditors' rights are, as it were, limited by sections 23 to 25. There will be many cases where an administrator will be called upon to make urgent and important decisions and where the urgency means that there is no possibility of a section 24 creditors' meeting being called to consider the decision prior to it having to be made. However, the importance of the decision and the time involved may well be such that the administrator should have what consultation he can with the creditors. An obvious case might be where there were three days to make a decision and there were only four creditors of the company, or there were four creditors who make up 80 per cent. in value of the total creditors of the company. In those circumstances, it seems to me that the administrators should at least consider consulting those four creditors. Whether he should effect any consultation, with whom he should effect it, how he should effect it and what decision he should make following any consultation must be matters for him to decide by reference to the facts of the individual case."

80.   While not in any way seeking to diminish the importance of the creditors' meeting in the context of an administration, I too recognise that the urgency of the situation and commercial pressures will sometimes require administrators to make a decision before a meeting can be convened. But in any such case it may still be possible for the administrators to consult with the creditors and, so far as circumstances permit and it is reasonable to do so, that is what they should do. It seems to me that much the same considerations apply to paragraph 71 of Schedule B1, for the underlying issue is the same, namely whether a sale should be authorised before it has been considered at the creditors' meeting. In the present case the Administrators did not require a direction from the court to exercise the general power of sale but they did require an order under paragraph 71 of Schedule B1 unless Mr O'Connell agreed to release his security. They believed and the judge accepted there was a real risk that, absent an order, the sale to Mr Palma would be lost and, despite his plain expression of interest, Mr Textor had not committed himself to buy the business and assets on the terms he had discussed. Further, the judge was well aware that Mr O'Connell and Mr Maass represented 80% by value of the creditors of the company and that Mr O'Connell opposed the sale to Mr Palma and Mr Maass supported it. In all these circumstances I believe the judge was entitled to proceed as he did.

81.   Finally, Mr Graham submitted that the hearing should have been adjourned until after the conclusion of the LCIA arbitration. Mr Graham did not place this ground at the forefront of his submissions, and rightly so. As I have explained, it was far from clear

when the substantive hearing would take place and, in the event, there is still no scheduled date for it. There was no realistic possibility that the Administrators could continue to trade MSL's business in the meantime. Inevitably, therefore, they had to carry out their duties on the basis that there was a real uncertainty over the intellectual property rights to which Mr O'Connell claimed the company was entitled.

### Conclusion

82.  For all of the reasons I have given, I believe the judge was entitled to exercise his discretion in the way that he did. The Administrators could not continue to trade until after the conclusion of the LCIA arbitration and even now it is far from clear that Mr O'Connell will prevail at the end of the day. There was, therefore, a considerable degree of uncertainty attaching to the value of MSL's intellectual property rights. The Administrators therefore decided to conduct a marketing exercise and then a competitive sale process with a view to selling the business and assets of the company, such as they were, for a fair and proper price. The sale realised a substantial sum, enabled a transfer of the company's 17 employees and avoided the accrual of further liabilities. Had the sale fallen through, there was a real risk the Administrators would have been forced to put the company into liquidation. In all these circumstances no basis has been shown for this court to interfere with the exercise by the judge of his discretion in the way that he did. It is therefore not necessary to address the issues raised by the Administrators in their respondents' notice and, these being points which were not argued out before us at the oral hearing, I prefer not to do so. Nor is it necessary to address a further point which was briefly touched upon in the course of oral submissions, namely from what date any re-exercise of discretion would have taken effect. I would dismiss this appeal.

### Lord Justice Floyd:

83.  I agree.

### Lord Justice Fulford:

84.  I also agree.

85.